# OHIO ADULT PAROLE AUTHORITY ET AL.
## *v.* WOODARD

No. 96–1769.   Argued December 10, 1997—Decided March 25, 1998

REHNQUIST, C. J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Part III, the opinion of the Court with respect to Part I, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Part II, in which SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 288. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 290.

*William A. Klatt,* First Assistant Attorney General of Ohio, argued the cause for petitioners. With him on the briefs were *Betty D. Montgomery,* Attorney General, *Jeffrey S. Sutton,* State Solicitor, *Simon B. Karas,* and *Jon C. Walden,* Assistant Attorney General.

*S. Adele Shank* argued the cause for respondent. With her on the brief were *David H. Bodiker*, by appointment of the Court, 522 U. S. 930, *Michael J. Benza*, by appointment of the Court, 522 U. S. 804, and *Gregory W. Meyers.**

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and III, and an opinion with respect to Part II in which JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join.

This case requires us to resolve two inquiries as to constitutional limitations on state clemency proceedings. The

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren*, Attorney General of California, *George Williamson*, Chief Assistant Attorney General, *Robert R. Anderson*, Senior Assistant Attorney General, *William G. Prahl*, Supervising Deputy Attorney General, and *Ward A. Campbell*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Albert B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *John Knox Walkup* of Tennessee, *Dan Morales* of Texas, *Jan Graham* of Utah, *Richard Cullen* of Virginia, *Christine O. Gregoire* of Washington, and *William U. Hill* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson*.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Daniel T. Kobil, Steven R. Shapiro*, and *Diann Y. Rust-Tierney*; and for the National Association of Criminal Defense Lawyers by *Andrea D. Lyon* and *Barbara E. Bergman*.

*Jerome J. Shestack* filed a brief for the American Bar Association as *amicus curiae*.

first is whether an inmate has a protected life or liberty interest in clemency proceedings, under either *Connecticut Bd. of Pardons* v. *Dumschat,* 452 U. S. 458 (1981), or *Evitts* v. *Lucey,* 469 U. S. 387 (1985). The second is whether giving inmates the option of voluntarily participating in an interview as part of the clemency process violates an inmate's Fifth Amendment rights.

We reaffirm our holding in *Dumschat, supra,* that "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Id.,* at 464 (footnote omitted). The Due Process Clause is not violated where, as here, the procedures in question do no more than confirm that the clemency and pardon powers are committed, as is our tradition, to the authority of the executive.[1] We further hold that a voluntary inmate interview does not violate the Fifth Amendment.

I

The Ohio Constitution gives the Governor the power to grant clemency upon such conditions as he thinks proper. Ohio Const., Art. III, § 2. The Ohio General Assembly cannot curtail this discretionary decisionmaking power, but it may regulate the application and investigation process. *State* v. *Sheward,* 71 Ohio St. 3d 513, 524–525, 644 N. E. 2d 369, 378 (1994). The General Assembly has delegated in large part the conduct of clemency review to petitioner Ohio Adult Parole Authority (Authority). Ohio Rev. Code Ann. § 2967.07 (1993).

In the case of an inmate under death sentence, the Authority must conduct a clemency hearing within 45 days of the scheduled date of execution. Prior to the hearing, the inmate may request an interview with one or more parole

---

[1] JUSTICE STEVENS in dissent says that a defendant would be entitled to raise an equal protection claim in connection with a clemency decision. *Post,* at 292. But respondent has raised no such claim here, and therefore we have no occasion to decide that question.

board members. Counsel is not allowed at that interview. The Authority must hold the hearing, complete its clemency review, and make a recommendation to the Governor, even if the inmate subsequently obtains a stay of execution. If additional information later becomes available, the Authority may in its discretion hold another hearing or alter its recommendation.

Respondent Eugene Woodard was sentenced to death for aggravated murder committed in the course of a carjacking. His conviction and sentence were affirmed on appeal, *State* v. *Woodard*, 68 Ohio St. 3d 70, 623 N. E. 2d 75 (1993), and this Court denied certiorari, 512 U. S. 1246 (1994). When respondent failed to obtain a stay of execution more than 45 days before his scheduled execution date, the Authority commenced its clemency investigation. It informed respondent that he could have a clemency interview on September 9, 1994, if he wished, and that his clemency hearing would be on September 16, 1994.

Respondent did not request an interview. Instead, he objected to the short notice of the interview and requested assurances that counsel could attend and participate in the interview and hearing. When the Authority failed to respond to these requests, respondent filed suit in United States District Court on September 14, alleging under Rev. Stat. § 1979, 42 U. S. C. § 1983, that Ohio's clemency process violated his Fourteenth Amendment right to due process and his Fifth Amendment right to remain silent.

The District Court granted the State's motion for judgment on the pleadings. The Court of Appeals for the Sixth Circuit affirmed in part and reversed in part. 107 F. 3d 1178 (1997). That court determined that under a "first strand" of due process analysis, arising out of the clemency proceeding itself, respondent had failed to establish a protected life or liberty interest. It noted that our decision in *Dumschat*, *supra*, at 464–465, "decisively rejected the argument that

federal law can create a liberty interest in clemency." 107 F. 3d, at 1183.

The Court of Appeals further concluded that there was no state-created life or liberty interest in clemency. *Id.*, at 1184–1185. Since the Governor retains complete discretion to make the final decision, and the Authority's recommendation is purely advisory, the State has not created a protected interest. *Olim* v. *Wakinekona*, 461 U. S. 238, 249 (1983). The court noted that it would reach the same conclusion under *Sandin* v. *Conner*, 515 U. S. 472 (1995), to the extent that decision modified the *Olim* analysis.

The Court of Appeals went on to consider, however, a "second strand" of due process analysis centered on "the role of clemency in the entire punitive scheme." 107 F. 3d, at 1186. The court relied on our statement in *Evitts* that "if a State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' . . . the procedures used in deciding appeals must comport with the demands of" due process. 469 U. S., at 393 (quoting *Griffin* v. *Illinois*, 351 U. S. 12, 18 (1956)). The court thought this reasoning logically applied to subsequent proceedings, including discretionary appeals, postconviction proceedings, and clemency.

Due process thus protected respondent's "original" life and liberty interests that he possessed before trial at each proceeding. But the amount of process due was in proportion to the degree to which the stage was an "integral part" of the trial process. Clemency, while not required by the Due Process Clause, was a significant, traditionally available remedy for preventing miscarriages of justice when judicial process was exhausted. It therefore came within the *Evitts* framework as an "integral part" of the adjudicatory system. However, since clemency was far removed from trial, the process due could be minimal. The Court did not itself decide what that process should be, but remanded to the District Court for that purpose.

Finally, the Court of Appeals also agreed with respondent that the voluntary interview procedure presented him with a "Hobson's choice" between asserting his Fifth Amendment rights and participating in the clemency review process, raising the specter of an unconstitutional condition. 107 F. 3d, at 1189. There was no compelling state interest that would justify forcing such a choice on the inmate. On the other hand, the inmate had a measurable interest in avoiding incrimination in ongoing postconviction proceedings, as well as with respect to possible charges for other crimes that could be revealed during the interview. While noting some uncertainties surrounding application of the unconstitutional conditions doctrine, the Court of Appeals concluded the doctrine could be applied in this case.

The dissenting judge would have affirmed the District Court's judgment. *Id.*, at 1194. He agreed with the majority's determination that there was no protected interest under *Dumschat*. But he thought that the majority's finding of a due process interest under *Evitts, supra,* was necessarily inconsistent with the holding and rationale of *Dumschat*. *Evitts* did not purport to overrule *Dumschat*. He also concluded that respondent's Fifth Amendment claim was too speculative, given the voluntary nature of the clemency interview. We granted certiorari, 521 U. S. 1117 (1997), and we now reverse.

## II

Respondent argues first, in disagreement with the Court of Appeals, that there is a life interest in clemency broader in scope than the "original" life interest adjudicated at trial and sentencing. *Ford* v. *Wainwright,* 477 U. S. 399 (1986). This continuing life interest, it is argued, requires due process protection until respondent is executed.[2] Relying on

---

[2] Respondent alternatively tries to characterize his claim as a challenge only to the application process conducted by the Authority, and not to the final discretionary decision by the Governor. Brief for Respondent 8. But, respondent still must have a protected life or liberty interest in the

Eighth Amendment decisions holding that additional procedural protections are required in capital cases, see, e. g., *Beck* v. *Alabama*, 447 U. S. 625, 637–638 (1980), respondent asserts that *Dumschat* does not control the outcome in this case because it involved only a liberty interest. JUSTICE STEVENS' dissent agrees on both counts. *Post*, at 291–292.

In *Dumschat*, an inmate claimed Connecticut's clemency procedure violated due process because the Connecticut Board of Pardons failed to provide an explanation for its denial of his commutation application. The Court held that "an inmate has 'no constitutional or inherent right' to commutation of his sentence." 452 U. S., at 464. It noted that, unlike probation decisions, "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Ibid.* The Court relied on its prior decision in *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex*, 442 U. S. 1 (1979), where it rejected the claim "that a constitutional entitlement to release [on parole] exists independently of a right explicitly conferred by the State." *Dumschat*, 452 U. S., at 463–464. The individual's interest in release or commutation "'is indistinguishable from the initial resistance to being confined,'" and that interest has already been extinguished by the conviction and sentence. *Id.*, at 464 (quoting *Greenholtz, supra*, at 7). The Court therefore concluded that a petition for commutation, like an appeal for clemency, "is simply a unilateral hope." 452 U. S., at 465.

Respondent's claim of a broader due process interest in Ohio's clemency proceedings is barred by *Dumschat*. The process respondent seeks would be inconsistent with the heart of executive clemency, which is to grant clemency as a

application process. Otherwise, as the Court of Appeals correctly noted, he is asserting merely a protected interest in process itself, which is not a cognizable claim. 107 F. 3d 1178, 1184 (CA6 1997); see also *Olim* v. *Wakinekona*, 461 U. S. 238, 249–250 (1983).

matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations. The dissent agrees with respondent that because "a living person" has a constitutionally protected life interest, it is incorrect to assert that respondent's life interest has been "extinguished." *Post*, at 291. We agree that respondent maintains a residual life interest, *e. g.*, in not being summarily executed by prison guards. However, as *Greenholtz* helps to make clear, respondent cannot use his interest in not being executed in accord with his sentence to challenge the clemency determination by requiring the procedural protections he seeks. 442 U. S., at 7.[3]

The reasoning of *Dumschat* did not depend on the fact that it was not a capital case. The distinctions accorded a life interest to which respondent and the dissent point, *post*, at 291–292, 293–295, are primarily relevant to trial. And this Court has generally rejected attempts to expand any distinctions further. See, *e. g.*, *Murray* v. *Giarratano*, 492 U. S. 1, 8–9 (1989) (opinion of REHNQUIST, C. J.) (there is no constitutional right to counsel in collateral proceedings for death row inmates; cases recognizing special constraints on capital proceedings have dealt with the trial stage); *Satterwhite* v. *Texas*, 486 U. S. 249, 256 (1988) (applying traditional standard of appellate review to a Sixth Amendment claim in a capital case); *Smith* v. *Murray*, 477 U. S. 527, 538 (1986) (applying same standard of review on federal habeas in capi-

---

[3] For the same reason, respondent's reliance on *Ford* v. *Wainwright*, 477 U. S. 399, 425 (1986), is misplaced. In *Ford*, the Court held that the Eighth Amendment prevents the execution of a person who has become insane since the time of trial. *Id.*, at 410. This substantive constitutional prohibition implicated due process protections. This protected interest, however, arose subsequent to trial, and was separate from the life interest already adjudicated in the inmate's conviction and sentence. See *id.*, at 425 (Powell, J., concurring). This interest therefore had not been afforded due process protection. The Court's recognition of a protected interest thus did not rely on the notion of a continuing "original" life interest.

tal and noncapital cases); *Ford, supra,* at 425 (Powell, J., concurring) (noting that the Court's decisions imposing heightened requirements on capital trials and sentencing proceedings do not apply in the postconviction context).[4]  The Court's analysis in *Dumschat,* moreover, turned not on the fact that it was a noncapital case, but on the nature of the benefit sought: "In terms of the Due Process Clause, a Connecticut felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison; it is simply a unilateral hope."  452 U. S., at 464 (footnote omitted).  A death row inmate's petition for clemency is also a "unilateral hope."  The defendant in effect accepts the *finality* of the death sentence for purposes of *adjudication,* and appeals for clemency as a matter of *grace.*

Respondent also asserts that, as in *Greenholtz,* Ohio has created protected interests by establishing mandatory clemency application and review procedures.  In *Greenholtz, supra,* at 11–12, the Court held that the expectancy of release on parole created by the mandatory language of the Nebraska statute was entitled to some measure of constitutional protection.

Ohio's clemency procedures do not violate due process.  Despite the Authority's mandatory procedures, the ultimate decisionmaker, the Governor, retains broad discretion.  Under any analysis, the Governor's executive discretion need not be fettered by the types of procedural protections sought by respondent.  See *Greenholtz, supra,* at 12–16 (recognizing the Nebraska parole statute created a protected liberty

---

[4] The dissent provides no basis for its assertion that the special considerations afforded a capital defendant's life interest at the trial stage "apply with special force to the final stage of the decisional process that precedes an official deprivation of life."  *Post,* at 295.  This not only ignores our case law to the contrary, *supra,* at 281 and this page, but also assumes that executive clemency hearings are part and parcel of the judicial process preceding an execution.

interest, yet rejecting a claim that due process necessitated a formal parole hearing and a statement of evidence relied upon by the parole board). There is thus no substantive expectation of clemency. Moreover, under *Conner*, 515 U. S., at 484, the availability of clemency, or the manner in which the State conducts clemency proceedings, does not impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ibid.*; see 107 F. 3d, at 1185–1186. A denial of clemency merely means that the inmate must serve the sentence originally imposed.

Respondent also relies on the "second strand" of due process analysis adopted by the Court of Appeals. He claims that under the rationale of *Evitts* v. *Lucey*, 469 U. S. 387 (1985), clemency is an integral part of Ohio's system of adjudicating the guilt or innocence of the defendant and is therefore entitled to due process protection. Clemency, he says, is an integral part of the judicial system because it has historically been available as a significant remedy, its availability impacts earlier stages of the criminal justice system, and it enhances the reliability of convictions and sentences. Respondent further suggests, as did the Sixth Circuit, that *Evitts* established a due process continuum across all phases of the judicial process.

In *Evitts*, the Court held that there is a constitutional right to effective assistance of counsel on a first appeal as of right. *Id.*, at 396. This holding, however, was expressly based on the combination of two lines of prior decisions. One line of cases held that the Fourteenth Amendment guarantees a criminal defendant pursuing a first appeal as of right certain minimum safeguards necessary to make that appeal adequate and effective, including the right to counsel. See *Griffin* v. *Illinois*, 351 U. S., at 20; *Douglas* v. *California*, 372 U. S. 353 (1963). The second line of cases held that the Sixth Amendment right to counsel at trial comprehended the right to effective assistance of counsel. See *Gideon* v. *Wainwright*, 372 U. S. 335, 344 (1963); *Cuyler* v. *Sullivan*,

446 U. S. 335, 344 (1980). These two lines of cases justified the Court's conclusion that a criminal defendant has a right to effective assistance of counsel on a first appeal as of right. *Evitts, supra,* at 394–396.

The Court did not thereby purport to create a new "strand" of due process analysis. And it did not rely on the notion of a continuum of due process rights. Instead, the Court evaluated the function and significance of a first appeal as of right, in light of prior cases. Related decisions similarly make clear that there is no continuum requiring varying levels of process at every conceivable phase of the criminal system. See, *e. g., Giarratano,* 492 U. S., at 9–10 (no due process right to counsel for capital inmates in state postconviction proceedings); *Pennsylvania* v. *Finley,* 481 U. S. 551, 555–557 (1987) (no right to counsel in state postconviction proceedings); *Ross* v. *Moffitt,* 417 U. S. 600, 610–611 (1974) (no right to counsel for discretionary appeals on direct review).

An examination of the function and significance of the discretionary clemency decision at issue here readily shows it is far different from the first appeal of right at issue in *Evitts.* Clemency proceedings are not part of the trial—or even of the adjudicatory process. They do not determine the guilt or innocence of the defendant, and are not intended primarily to enhance the reliability of the trial process. They are conducted by the executive branch, independent of direct appeal and collateral relief proceedings. *Greenholtz,* 442 U. S., at 7–8. And they are usually discretionary, unlike the more structured and limited scope of judicial proceedings. While traditionally available to capital defendants as a final and alternative avenue of relief, clemency has not traditionally "been the business of courts." *Dumschat,* 452 U. S., at 464. Cf. *Herrera* v. *Collins,* 506 U. S. 390, 411–415 (1993) (recognizing the traditional availability and significance of clemency as part of executive authority, without suggesting that clemency proceedings are subject to judicial review); *Ex*

*parte Grossman,* 267 U. S. 87, 120–121 (1925) (executive clemency exists to provide relief from harshness or mistake in the judicial system, and is therefore vested in an authority other than the courts).

Thus, clemency proceedings are not "'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,'" *Evitts, supra,* at 393 (quoting *Griffin* v. *Illinois, supra,* at 18). Procedures mandated under the Due Process Clause should be consistent with the nature of the governmental power being invoked. Here, the executive's clemency authority would cease to be a matter of grace committed to the executive authority if it were constrained by the sort of procedural requirements that respondent urges. Respondent is already under a sentence of death, determined to have been lawfully imposed. If clemency is granted, he obtains a benefit; if it is denied, he is no worse off than he was before.[5]

### III

Respondent also presses on us the Court of Appeals' conclusion that the provision of a voluntary inmate interview, without the benefit of counsel or a grant of immunity for any statements made by the inmate, implicates the inmate's Fifth and Fourteenth Amendment right not to incriminate himself. Because there is only one guaranteed clemency review, respondent asserts, his decision to participate is not truly voluntary. And in the interview he may be forced to answer questions; or, if he remains silent, his silence may be used against him. Respondent further asserts there is a substantial risk of incrimination since postconviction proceedings are in progress and since he could potentially incriminate himself on other crimes. Respondent therefore concludes that the interview unconstitutionally conditions his assertion

---

[5] The dissent mischaracterizes the question at issue as a determination to deprive a person of life. *Post,* at 290. That determination has already been made with all required due process protections.

of the right to pursue clemency on his waiver of the right to remain silent. While the Court of Appeals accepted respondent's rubric of "unconstitutional conditions," we find it unnecessary to address it in deciding this case. In our opinion, the procedures of the Authority do not under any view violate the Fifth Amendment privilege.

The Fifth Amendment protects against compelled self-incrimination. See *Baxter* v. *Palmigiano*, 425 U. S. 308, 316–318 (1976). The record itself does not tell us what, if any, use is made by the board of the clemency interview, or of an inmate's refusal to answer questions posed to him at that interview. But the Authority in its brief dispels much of the uncertainty:

> "Nothing in the procedure grants clemency applicants immunity for what they might say or makes the interview in any way confidential. Ohio has permissibly chosen not to allow the inmate to say one thing in the interview and another in a habeas petition, and no amount of discovery will alter this feature of the procedure." Reply Brief for Petitioners 6.

Assuming also that the Authority will draw adverse inferences from respondent's refusal to answer questions—which it may do in a civil proceeding without offending the Fifth Amendment, *Palmigiano*, *supra*, at 316–318—we do not think that respondent's testimony at a clemency interview would be "compelled" within the meaning of the Fifth Amendment. It is difficult to see how a voluntary interview could "compel" respondent to speak. He merely faces a choice quite similar to the sorts of choices that a criminal defendant must make in the course of criminal proceedings, none of which has ever been held to violate the Fifth Amendment.

Long ago we held that a defendant who took the stand in his own defense could not claim the privilege against self-incrimination when the prosecution sought to cross-examine

him. *Brown* v. *Walker,* 161 U. S. 591, 597–598 (1896); *Brown* v. *United States,* 356 U. S. 148, 154–155 (1958). A defendant who takes the stand in his own behalf may be impeached by proof of prior convictions without violation of the Fifth Amendment privilege. *Spencer* v. *Texas,* 385 U. S. 554, 561 (1967). A defendant whose motion for acquittal at the close of the government's case is denied must then elect whether to stand on his motion or to put on a defense, with the accompanying risk that in doing so he will augment the government's case against him. *McGautha* v. *California,* 402 U. S. 183, 215 (1971). In each of these situations, there are undoubted pressures—generated by the strength of the government's case against him—pushing the criminal defendant to testify. But it has never been suggested that such pressures constitute "compulsion" for Fifth Amendment purposes.

In *Williams* v. *Florida,* 399 U. S. 78 (1970), it was claimed that Florida's requirement of advance notice of alibi from a criminal defendant, in default of which he would be precluded from asserting the alibi defense, violated the privilege. We said:

> "Nothing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice. That choice must be made, but the pressures that bear on his pretrial decision are of the same nature as those that would induce him to call alibi witnesses at the trial: the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not compelled self-incrimination transgressing the Fifth and Fourteenth Amendments." *Id.,* at 84–85 (footnote omitted).

Here, respondent has the same choice of providing information to the Authority—at the risk of damaging his case for

clemency or for postconviction relief—or of remaining silent. But this pressure to speak in the hope of improving his chance of being granted clemency does not make the interview compelled. We therefore hold that the Ohio clemency interview, even on assumptions most favorable to respondent's claim, does not violate the Fifth Amendment privilege against compelled self-incrimination.

## IV

We hold that neither the Due Process Clause nor the Fifth Amendment privilege against self-incrimination is violated by Ohio's clemency proceedings. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE O'CONNOR, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in part and concurring in the judgment.

A prisoner under a death sentence remains a living person and consequently has an interest in his life. The question this case raises is the issue of what process is constitutionally necessary to protect that interest in the context of Ohio's clemency procedures. It is clear that "once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly." *Ford* v. *Wainwright,* 477 U. S. 399, 429 (1986) (O'CONNOR, J., concurring in result in part and dissenting in part). I do not, however, agree with the suggestion in the principal opinion that, because clemency is committed to the discretion of the executive, the Due Process Clause provides *no constitutional safeguards.* THE CHIEF JUSTICE's reasoning rests on our decisions in *Connecticut Bd. of Pardons* v. *Dumschat,* 452 U. S. 458 (1981), and *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex,* 442 U. S. 1 (1979). In those cases, the Court found that an inmate seeking commutation of a life sentence or discre-

tionary parole had no protected liberty interest in release from lawful confinement. When a person has been fairly convicted and sentenced, his liberty interest, in being free from such confinement, has been extinguished. But it is incorrect, as JUSTICE STEVENS' dissent notes, to say that a prisoner has been deprived of all interest in his life before his execution. See *post*, at 291–292. Thus, although it is true that "pardon and commutation decisions have not traditionally been the business of courts," *Dumschat, supra,* at 464, and that the decision whether to grant clemency is entrusted to the Governor under Ohio law, I believe that the Court of Appeals correctly concluded that some *minimal* procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process.

In my view, however, a remand to permit the District Court to address respondent's specific allegations of due process violations is not required. The Ohio Death Penalty Clemency Procedure provides that, if a stay has not yet issued, the parole board must schedule a clemency hearing 45 days before an execution for a date approximately 21 days in advance of the execution. The board must also advise the prisoner that he is entitled to a prehearing interview with one or more parole board members. Although the Ohio Adult Parole Authority complied with those instructions here, respondent raises several objections to the process afforded him. He contends that 3 days' notice of his interview and 10 days' notice of the hearing were inadequate; that he did not have a meaningful opportunity to prepare his clemency application because postconviction proceedings were pending; that his counsel was improperly excluded from the interview and permitted to participate in the hearing only at the discretion of the parole board chair; and that he was precluded from testifying or submitting documentary evi-

dence at the hearing. I do not believe that any of these allegations amounts to a due process violation. The process respondent received, including notice of the hearing and an opportunity to participate in an interview, comports with Ohio's regulations and observes whatever limitations the Due Process Clause may impose on clemency proceedings. Moreover, I agree that the voluntary inmate interview that forms part of Ohio's process did not violate respondent's Fifth and Fourteenth Amendment privilege against self-incrimination.

Accordingly, I join Parts I and III of the Court's opinion and concur in the judgment.

JUSTICE STEVENS, concurring in part and dissenting in part.

When a parole board conducts a hearing to determine whether the State shall actually execute one of its death row inmates—in other words, whether the State shall deprive that person of life—does it have an obligation to comply with the Due Process Clause of the Fourteenth Amendment? In my judgment, the text of the Clause provides the answer to that question. It expressly provides that no State has the power to "deprive any person of life, liberty, or property, without due process of law."

Without deciding what "minimal, perhaps even barely perceptible," procedural safeguards are required in clemency proceedings, the Court of Appeals correctly answered the basic question presented and remanded the case to the District Court to determine whether Ohio's procedures meet the "minimal" requirements of due process.[1] In Part II of his opinion today, however, THE CHIEF JUSTICE takes a different view—essentially concluding that a clemency proceeding could *never* violate the Due Process Clause. Thus, under such reasoning, even procedures infected by bribery, per-

---

[1] 107 F. 3d 1178, 1187–1188 (CA6 1997).

sonal or political animosity, or the deliberate fabrication of false evidence would be constitutionally acceptable. Like JUSTICE O'CONNOR, I respectfully disagree with that conclusion.

I

The text of the Due Process Clause properly directs our attention to state action that may "deprive" a person of life, liberty, or property. When we are evaluating claims that the State has unfairly deprived someone of liberty or property, it is appropriate first to ask whether the state action adversely affected any constitutionally protected interest. Thus, we may conclude, for example, that a prisoner has no "liberty interest" in the place where he is confined, *Meachum* v. *Fano*, 427 U. S. 215 (1976), or that an at-will employee has no "property interest" in his job, *Bishop* v. *Wood*, 426 U. S. 341 (1976). There is, however, no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does.

Nor does *Connecticut Bd. of Pardons* v. *Dumschat*, 452 U. S. 458 (1981), counsel a different conclusion. In that case the Court held that a refusal to commute a prison inmate's life sentence was not a deprivation of his liberty because the liberty interest at stake had already been extinguished. *Id.*, at 461, 464. The holding was supported by the "crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty one desires." *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex*, 442 U. S. 1, 9 (1979).[2] That "crucial distinction" points

---

[2] "Our language in *Greenholtz* leaves no room for doubt: 'There is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty."' 442 U. S., at 7 (emphasis supplied; citation omitted). *Greenholtz* pointedly dis-

in the opposite direction in this case because respondent is contesting the State's decision to deprive him of life that he still has, rather than any conditional liberty that he desires. Thus, it is abundantly clear that respondent possesses a life interest protected by the Due Process Clause.

## II

There are valid reasons for concluding that even if due process is required in clemency proceedings, only the most basic elements of fair procedure are required. Presumably a State might eliminate this aspect of capital sentencing entirely, and it unquestionably may allow the executive virtually unfettered discretion in determining the merits of appeals for mercy. Nevertheless, there are equally valid reasons for concluding that these proceedings are not entirely exempt from judicial review. I think, for example, that no one would contend that a Governor could ignore the commands of the Equal Protection Clause and use race, religion, or political affiliation as a standard for granting or denying clemency. Our cases also support the conclusion that if a State adopts a clemency procedure as an integral part of its system for finally determining whether to deprive a person of life, that procedure must comport with the Due Process Clause.

Even if a State has no constitutional obligation to grant criminal defendants a right to appeal, when it does establish appellate courts, the procedures employed by those courts must satisfy the Due Process Clause. *Evitts* v. *Lucey,* 469 U. S. 387, 396 (1985). Likewise, even if a State has no duty to authorize parole or probation, if it does exercise its discre-

tinguished parole revocation and probation revocation cases, noting that there is a 'critical' difference between denial of a prisoner's request for initial release on parole and revocation of a parolee's conditional liberty. *Id.,* at 9–11, quoting, *inter alia,* Friendly, 'Some Kind of Hearing,' 123 U. Pa. L. Rev. 1267, 1296 (1975)." *Connecticut Bd. of Pardons* v. *Dumschat,* 452 U. S. 458, 464 (1981) (footnote omitted).

tion to grant conditional liberty to convicted felons, any decision to deprive a parolee or a probationer of such conditional liberty must accord that person due process. *Morrissey* v. *Brewer*, 408 U. S. 471, 480–490 (1972); *Gagnon* v. *Scarpelli*, 411 U. S. 778, 781–782 (1973). Similarly, if a State establishes postconviction proceedings, these proceedings must comport with due process.[3]

The interest in life that is at stake in this case warrants even greater protection than the interests in liberty at stake in those cases.[4] For "death is a different kind of punishment

---

[3] While it is true that the constitutional protections in state postconviction proceedings are less stringent than at trial or on direct review, *e. g., Pennsylvania* v. *Finley*, 481 U. S. 551, 555–557 (1987), we have never held or suggested that the Due Process Clause does not apply to these proceedings. Indeed, *Finley* itself asked whether the State's postconviction proceedings comported with the "fundamental fairness mandated by the Due Process Clause." *Id.*, at 556–557; see also *Murray* v. *Giarratano*, 492 U. S. 1, 8 (1989) (opinion of REHNQUIST, C. J.) ("'[T]he fundamental fairness mandated by the Due Process Clause does not require that the [S]tate supply a lawyer'" (quoting *Finley*, 481 U. S., at 557)). THE CHIEF JUSTICE, then, is simply wrong when he states that these cases "make clear that there is no continuum requiring varying levels of process at every . . . phase of the criminal system," *ante*, at 284; instead, these cases simply turned on *what process is due.* If there could be any question whether state postconviction proceedings are subject to due process protections, our unanimous opinion in *Yates* v. *Aiken*, 484 U. S. 211, 217–218 (1988), makes it clear that they are.

[4] The Court has recognized the integral role that clemency proceedings play in the decision whether to deprive a person of life. *Herrera* v. *Collins*, 506 U. S. 390, 411–417 (1993). Indeed, every one of the 38 States that has the death penalty also has clemency procedures. Ala. Const., Amdt. 38, Ala. Code § 15–18–100 (1995); Ariz. Const., Art. V, § 5, Ariz. Rev. Stat. Ann. §§ 31–443, 31–445 (1996); Ark. Const., Art. VI, § 18, Ark. Code Ann. § 5–4–607 (1997), and § 16–93–204 (Supp. 1997); Cal. Const., Art. V, § 8, Cal. Penal Code Ann. §§ 4800–4807 (West 1982 and Supp. 1998); Colo. Const., Art. IV, § 7, Colo. Rev. Stat. §§ 16–17–101, 16–17–102 (1997); Conn. Const., Art. IV, § 13, Conn. Gen. Stat. § 18–26 (1997); Del. Const., Art. VII, § 1, Del. Code Ann., Tit. 29, § 2103 (1997); Fla. Const., Art. IV, § 8, Fla. Stat. § 940.01 (1997); Ga. Const., Art. IV, § 2, ¶ 2, Ga. Code Ann. §§ 42–9–20, 42–9–42 (1997); Idaho Const., Art. IV, § 7, Idaho Code § 20–240 (1997);

from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U. S. 349, 357–

Ill. Const., Art. V, § 12, Ill. Comp. Stat., ch. 730, § 5/3–3–13 (1997); Ind. Const., Art. V, § 17, Ind. Code §§ 11–9–2–1 to 11–9–2–4, 35–38–6–8 (1993); Kan. Const., Art. I, § 7, Kan. Stat. Ann. § 22–3701 (1995); Ky. Const., § 77; La. Const., Art. IV, § 5(E), La. Rev. Stat. Ann. § 15:572 (West 1992); Md. Const., Art. II, § 20, Md. Ann. Code, Art. 27, § 77 (1996), and Art. 41, § 4–513 (1997); Miss. Const., Art. V, § 124, Miss. Code Ann. § 47–5–115 (1981); Mo. Const., Art. IV, § 7, Mo. Rev. Stat. §§ 217.220, 217.800, 552.070 (1994); Mont. Const., Art. VI, § 12, Mont. Code Ann. §§ 46–23–301 to 46–23–316 (1994); Neb. Const., Art. IV, § 13, Neb. Rev. Stat. §§ 83–1,127 to 83–1,132 (1994); Nev. Const., Art. V, § 13, Nev. Rev. Stat. § 213.080 (1995); N. H. Const., pt. 2, Art. 52, N. H. Rev. Stat. Ann. § 4:23 (1988); N. J. Const., Art. V, § 2, ¶ 1, N. J. Stat. Ann. § 2A:167–4 (West 1985); N. M. Const., Art. V, § 6, N. M. Stat. Ann. § 31–21–17 (Supp. 1997); N. Y. Const., Art. IV, § 4, N. Y. Exec. Law §§ 15–19 (McKinney 1993); N. C. Const., Art. III, § 5(6), N. C. Gen. Stat. §§ 147–23 to 147–25 (1993); Ohio Const., Art. III, § 11, Ohio Rev. Code Ann. §§ 2967.01 to 2967.12 (1996); Okla. Const., Art. VI, § 10, Okla. Stat., Tit. 21, § 701.11a (Supp. 1998); Ore. Const., Art. V, § 14, Ore. Rev. Stat. §§ 144.640 to 144.670 (1991); Pa. Const., Art. IV, § 9; S. C. Const., Art. IV, § 14, S. C. Code Ann. §§ 24–21–910 to 24–21–1000 (1977 and Supp. 1997); S. D. Const., Art. IV, § 3, S. D. Codified Laws §§ 23A–27A–20 to 23A–27A–21, 24–14–1 to 24–14–7 (1988); Tenn. Const., Art. III, § 6, Tenn. Code Ann. §§ 40–27–101 to 40–27–109 (1997); Tex. Const., Art. IV, § 11, Tex. Code Crim. Proc. Ann., Art. 48.01 (Vernon Supp. 1997); Utah Const., Art. VII, § 12, Utah Code Ann. § 77–27–5.5 (1995); Va. Const., Art. V, § 12, Va. Code Ann. §§ 53.1–229 to 53.1–231 (1994); Wash. Const., Art. III, § 9, Wash. Rev. Code § 10.01.120 (1994); Wyo. Const., Art. IV, § 5, Wyo. Stat. § 7–13–801 (1995). It is, of course, irrelevant that States need not establish clemency proceedings; having established these proceedings, they must comport with due process. See *Evitts* v. *Lucey*, 469 U. S. 387, 393, 400–401 (1985).

358 (1977) (citations omitted) (plurality opinion). Those considerations apply with special force to the final stage of the decisional process that precedes an official deprivation of life.

Accordingly, while I join Part III of the Court's opinion, I cannot accept the reasoning or the conclusion in Part II. Because this case comes to us in an interlocutory posture, I agree with the Court of Appeals that the case should be remanded to the District Court, "in light of relevant evidentiary materials submitted by the parties,"[5] for a determination whether Ohio's procedures meet the minimum requirements of due process.

---

[5] 107 F. 3d, at 1194.