[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  23-11277-P

_____

DARRYL BRYAN BARWICK,

Plaintiff - Appellant,

versus

GOVERNOR OF FLORIDA,
ATTORNEY GENERAL OFFICE,
JIMMY PATRONIS, CHIEF FINANCIAL OFFICER
WILTON SIMPSON, COMMISSIONER OF AGRICULTRUE
MELINDA COONROD, CHAIRWOMAN, FLORIDA COMMISSION ON OFFENDER
REVIEW
SUSAN MICHELLE WHITWORTH, COORDINATOR, OFFICE OF EXECUTIVE
CLEMENCY
STEPHEN HEBERT, DIRECTOR, OFFICE OF CLEMENCY INVESTIGATIONS

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

Before: WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges

PER CURIAM:

Darryl Bryan Barwick is a Florida death-row prisoner who is scheduled to be executed on

May 3, 2023, at 6:00 p.m.

Barwick brought an action under 42 U.S.C. § 1983, arguing that the Governor of Florida

and several other state officials violated his constitutional right to due process because they did

not adequately consider his candidacy for executive clemency. He also moved for an emergency stay of execution. The district court denied Barwick's motion for a stay.

Barwick then moved in this Court for a stay of execution pending appeal. After reviewing the record and governing legal standards, we too must deny Barwick's motion for a stay.

## I.    BACKGROUND

Barwick is a Florida death-row prisoner who was sentenced to death in 1992 following his conviction for the murder of Rebecca Wendt. His execution is scheduled for May 3, 2023. We previously discussed the facts of Barwick's crimes in *Barwick v. Secretary, Florida Department of Corrections*, 794 F.3d 1239, 1241–42 (11th Cir. 2015) (per curiam). *See also Barwick v. State*, 660 So. 2d 685, 688–89 (Fla. 1995) (per curiam). We do not repeat that discussion here. Rather, because the challenge before us centers on Florida's clemency proceedings, we focus there.

### A.    Florida's Clemency Regime

Florida law provides the executive branch with the authority to commute punishments, and state law does not impose any legal limitations on officials' exercise of their discretion. Fla. Const. art. IV, § 8(a); Fla. Stat. § 940.01(1); *see also Bowles v. DeSantis*, 934 F.3d 1230, 1235–36 (11th Cir. 2019).

The Governor and the Cabinet, which collectively sit as the Clemency Board, have adopted the Florida Rules of Executive Clemency. *See Parole Comm'n v. Lockett*, 620 So. 2d 153, 155 (Fla. 1993). Rule 15 governs the "Commutation of Death Sentences." Fla. R. Exec. Clemency 15. It provides that the Florida Commission on Offender Review ("Commission")—which is distinct from the Clemency Board—"may conduct a thorough and detailed investigation into all factors relevant to the issue of clemency and provide a final report to the Clemency Board." *Id.* And Florida law requires that the Commission report to the Board "the circumstances, the criminal records, and the social, physical, mental, and psychiatric conditions and histories of persons under

consideration by the board for pardon, commutation of sentence, or remission of fine, penalty, or forfeiture." Fla. Stat. § 947.13(1)(e).

But Rule 15 does not delineate the "factors relevant to the issue of clemency," nor does Florida law otherwise include specific enumerated factors that should be considered during the clemency process. Instead, the Rules dictate that "[t]he Governor has the unfettered discretion to deny clemency at any time, for any reason." Fla. R. Exec. Clemency 4.[1]

The Rules' specific requirements for the Commission investigation are largely procedural. For example, Rule 15 directs that the investigation "shall include, but not be limited to: (1) an interview with the inmate, who may have clemency counsel present, by [the Commission]; (2) an interview, if possible, with the trial attorneys who prosecuted the case and defended the inmate; (3) an interview, if possible, with the presiding judge; and (4) an interview, if possible, with the defendant's family." Fla. R. Exec. Clemency 15(B). And once the investigation is complete, the Commission is directed to issue a final report, which "shall include: (1) any statements made by the defendant, and defendant's counsel, during the course of the investigation; (2) a detailed summary from each Commissioner who interviewed the inmate; and (3) information gathered during the course of the investigation." Fla. R. Exec. Clemency 15(D).[2]

---

[1] The inverse is also true. "The Governor, with the approval of at least two members of the Clemency Board, has the unfettered discretion to grant, at any time, for any reason" the enumerated forms of clemency. Fla. R. Exec. Clemency 4.

[2] Rule 15 also provides that "[f]ailure to conduct or complete the investigation pursuant to these rules shall not be a ground for relief for the death penalty defendant." Fla. R. Exec. Clemency 15(C).

B.        *Barwick's Clemency Process*

According to Barwick's complaint, in 2020, Barwick began receiving legal services to support him in the clemency proceeding.  Barwick's clemency interview took place on April 29, 2021, with Barwick, his counsel, and two Commissioners, Richard Davison and David Wyant.[3]

At the clemency interview, Davison initially stated that the interview would be reviewed by the Governor and the other members of the Clemency Board to determine whether Barwick's case should be heard before the full Board.  Davison explained that the Commission "is not here to review what happened during [Barwick's] court proceedings or to determine [his] innocence or guilt."  "The purpose of this interview," Davison continued, is to give Barwick "an opportunity to make any statements or comments concerning commutation to life of the death sentence imposed."

Barwick told the Commission about his childhood, and specifically about the abuse he received from his father.  For example, Barwick said his father would beat him with "[w]hatever he could get his hands on," such as a two-by-four or baseball bat.  After those beatings, Barwick would sustain injuries and would not go to school until they healed.  Barwick also expressed remorse for his crimes and explained that he would hope to continue contributing in prison if his sentence was commuted to life imprisonment.

The Commissioners asked Barwick about his childhood, including about the beatings he received from his father and about his relationships with his siblings.  They also asked Barwick questions about his crimes.  For example, when asked why he killed Ms. Wendt or why he decided to commit crimes that he knew to be wrong, Barwick said he did not know.  And Barwick said, in response to one of the Commissioners' questions, he would consider himself to be a sexual deviant.

---

[3] Also present at the interview were the Commission's Investigator Supervisor, John Steve Dawson, and the Capital Punishment Research Specialist, Brandy Fortune.

Following the hearing, Barwick's counsel provided the Commission with a few reports and letters to bolster Barwick's application for commutation of his death sentence. These materials included a letter from Dr. Hyman H. Eisenstein, which explained that Barwick "has a history of multiple brain injuries," which have impaired his planning and decisionmaking and his ability to remember the facts of his crimes.

On April 3, 2023, Governor DeSantis determined that "executive clemency is not appropriate" for Barwick and issued a death warrant setting Barwick's execution for May 3, 2023.

### C.        Procedural History

On April 13, 2013, Barwick initiated this action in federal district court, alleging that the Governor and the other members of the Clemency Board violated his federal constitutional right to due process through an inadequate consideration process of his candidacy for clemency. He also moved for an emergency stay of execution. Barwick's central argument supporting his complaint and his request for a stay is that his clemency proceeding was decided on an arbitrary basis because the Florida clemency scheme sets forth no standards upon which his candidacy should have been decided, and because the Commission provided false guidance when it suggested it was not concerned with his underlying guilt but then focused its interview on the facts of his crimes.

The state officials ("State") opposed Barwick's motion for a stay of execution, arguing that Barwick's due-process claim is unlikely to succeed on the merits and that, under controlling precedent, last-minute stays of execution are disfavored. The State's merits argument posits that clemency is strictly an executive function and that Florida's clemency process satisfies the minimal procedural safeguards that the Due Process Clause requires. Relying on similar arguments, the State also moved to dismiss Barwick's complaint.

The district court denied Barwick's motion for a stay of execution. The court held that Barwick received process as good as or better than other prisoners who brought similar challenges, which were ultimately rejected. The district court also noted that the Commission interviewers asked Barwick questions about the mitigating circumstances he had mentioned, that the record shows that the Clemency Board decided his candidacy on the merits, and that more detailed standards governing clemency claims are unlikely to have made a difference.

Barwick moved in this Court for an emergency stay of execution pending appeal.

## II.    STANDARD OF REVIEW

We may grant a stay of execution only if the prisoner "establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest." *Bowles*, 934 F.3d at 1238 (citation omitted). To obtain a stay, the prisoner "must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

## III.    DISCUSSION

Our discussion of Barwick's motion for stay of execution proceeds in two parts. We first ensure that federal jurisdiction to consider Barwick's claim exists. After assuring ourselves of jurisdiction, we consider the merits of Barwick's motion.

### A.    Federal jurisdiction is proper.

We must first ensure that federal jurisdiction exists over Barwick's claim because "we are obligated to address jurisdictional questions *sua sponte* whenever jurisdiction may be lacking." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 905 (11th Cir. 2013) (quotation marks and citation omitted). Here, the parties and the district court have suggested that there may be a

question about whether an action under 42 U.S.C. § 1983 is the correct procedural vehicle for Barwick's claim about the alleged deficiencies in his clemency process.

In *Spivey v. State Board of Pardons & Paroles*, we held that a prisoner's action alleging that he was improperly denied clemency was incorrectly brought under § 1983 when it should have been treated as a second or successive petition for habeas relief. 279 F.3d 1301, 1303 (11th Cir. 2002) (per curiam). We therefore concluded in that case that the district court did not have jurisdiction and that we could not consider the prisoner's appeal of an order denying his motion for stay of execution. *Id.* at 1303–04.

But since *Spivey*, the Supreme Court has clarified that "§ 1983 remains available for procedural challenges where success in the action *would not necessarily* spell immediate or speedier release for the prisoner." *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005) (emphasis in original). And following the Supreme Court's clarification in *Wilkinson*, we have explained that a prisoner's "complaint about Florida's clemency procedures may only be brought under 42 U.S.C. § 1983." *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1268 (11th Cir. 2011) (per curiam). We have thus considered the merits of several prisoners' challenges brought under § 1983 that concern state clemency proceedings and that resemble the claim brought in *Spivey* and the claim Barwick brings here. *See, e.g.*, *Mann v. Palmer*, 713 F.3d 1306, 1316–17 (11th Cir. 2013); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1332–33 (11th Cir. 2015); *Bowles*, 934 F.3d at 1239.

And since our post-*Wilkinson* decisions, the Supreme Court has expanded on the distinction between § 1983 claims and habeas claims. In *Nance v. Ward*, the Court explained that the text of § 1983 "broadly authorizes suit against state officials for the 'deprivation of any rights' secured by the Constitution." 142 S. Ct. 2214, 2221 (2022) (quoting 42 U.S.C. § 1983). But the Court has

not "read § 1983 literally in the prisoner context" because doing so would "swamp[] the habeas statute's coverage of claims that the prisoner is 'in custody in violation of the Constitution.'" *Id.* (quoting 28 U.S.C. § 2254(a)). So the Court has "insisted that § 1983 contains an 'implicit exception' for actions that lie 'within the core of habeas corpus.'" *Id.* (quoting *Wilkinson*, 544 U.S. at 79). And defining that core focuses on "whether a claim challenges the validity of a conviction or sentence," such as "when an inmate seeks to overturn his death sentence, thus preventing the State from executing him." *Id.* at 2221–22. In other words, "[a] claim should go to habeas . . . only if granting the prisoner relief 'would *necessarily* prevent the State from carrying out its execution.'" *Id.* at 2222 (quoting *Nelson v. Campbell*, 541 U.S. 637, 647 (2005)) (emphasis in *Nelson*) (alteration adopted).

Applying those principles and controlling precedent, Barwick's action is properly brought under § 1983, and we explicitly recognize the Supreme Court's abrogation of *Spivey* under *Wilkinson* and *Nance*. Barwick's complaint expressly does not challenge the ultimate validity of his death sentence, nor would a successful claim necessarily mean that the State could not carry out its execution. Instead, Barwick seeks an injunction "barring Defendants from executing him until Defendants provide him with an executive clemency process comporting with the United States Constitution." Compl. ¶ 53. In other words, if Florida's clemency process here violated the Due Process Clause, Florida could cure any violation by providing constitutionally adequate process. It could then proceed with its proposed execution if the Clemency Board determined that clemency was not warranted. *See Valle*, 654 F.3d at 1268 ("Even if successful, [the prisoner's] claim would not necessarily lead to his speedier release, a commutation of his sentence, or even the implication that his sentence is invalid. The most [the prisoner] can hope for is an opportunity to plead for mercy.").

We therefore have jurisdiction to consider the merits of Barwick's claim.

### B.    The State did not violate the Due Process Clause.

The State first contends that we should not consider the substance of Barwick's claim and that his motion "should be denied based on delay alone." We disagree. The record shows that the Board did not make a decision on Barwick's clemency candidacy until April 3, 2023, when the Governor issued the death warrant, noting that "it has been determined that executive clemency is not appropriate." Until that point, Barwick had no reason to challenge the State's executive clemency process. So we cannot see how, contrary to the State's contention, Barwick "deliberately waited" to file this challenge until a decision would also require a stay of execution. The only reason for the timing of Barwick's lawsuit in relation to the scheduled execution is the Governor's decision to simultaneously deny clemency and issue the death warrant.

Turning to the merits, because Barwick appeals the district court's order denying his motion for a stay of execution, we review to determine whether the district court abused its discretion. *Bowles*, 934 F.3d at 1238. The "first and most important question" concerning Barwick's request for a stay is whether he can demonstrate a substantial likelihood of success on the merits. *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1292 (11th Cir. 2016). As it turns out, our discussion begins and ends there.

The merits of Barwick's arguments turn on whether the State's clemency process in his case violated the Due Process Clause of the Fourteenth Amendment. Barwick contends that the State deprived him of due process because there are no standards governing clemency decisions and because the Commissioners ignored the only ostensible standard—that the process is not concerned with Barwick's guilt for his crimes—by focusing this clemency interview on the circumstances of his crime and his prior criminal conduct.

The Supreme Court has recognized that death-row prisoners have a due-process interest in the context of state clemency proceedings. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998). Justice O'Connor's concurring opinion provides the holding in *Woodard*. *See Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (acknowledging that Justice O'Connor's concurrence "set binding precedent"); *see also Gissendaner*, 794 F.3d at 1331. Her opinion recognizes that a death-row prisoner's life interest secured by the Due Process Clause necessitates that "some *minimal* procedural safeguards apply to clemency proceedings." *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring in part and concurring in the judgment) (emphasis in original).

Justice O'Connor explained that "[j]udicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* But in *Woodard* itself, Ohio's clemency procedures—which provided the prisoner with three days' notice of his clemency interview, ten days' notice of his hearing, excluded his counsel at the interview, and prohibited evidence at the hearing—did not violate the Due Process Clause. *Id.* at 289–90.

In the years following *Woodard*, we have said that "[t]he key word" in Justice O'Connor's opinion "is 'minimal.'" *Gissendaner*, 794 F.3d at 1331. And we have emphasized that clemency is "discretionary" and is "granted as 'a matter of grace.'" *Valle*, 654 F.3d at 1268 (quoting *Woodard*, 523 U.S. at 280–81 (plurality opinion)); *see also Bowles*, 934 F.3d at 1242. Based on those governing standards, we have repeatedly upheld state clemency proceedings when they have been challenged under the Due Process Clause.

For example, in *Gissendaner*, the prisoner argued that the state violated her constitutional rights after she lost the opportunity to obtain and present evidence because corrections-staff members allegedly feared losing their jobs if they testified on her behalf. 794 F.3d at 1332. A panel of this Court said that Justice O'Connor's opinion in *Woodard* did not "suggest[] that a clemency board's compliance with state laws or procedures is part of the '*minimal* procedural safeguards' protected by the Due Process Clause," and therefore upheld the state's procedures, even if they violated state law. *Id.* at 1333; *see also Wellons*, 754 F.3d at 1296 (holding prisoner's due-process interest was not violated after a corrections officer who had been willing to support clemency later refused to do so for fear of losing his job).

And in *Mann*, we rejected a prisoner's argument that he was entitled to a new clemency hearing after the Governor of Florida considered an updated clemency investigation before signing the death warrant. 713 F.3d at 1316. Neither state law nor the Due Process Clause required additional procedures before the Governor's decision, we said. *Id.* at 1316–17; *see also Gilreath v. State Bd. of Pardons & Paroles*, 273 F.3d 932, 934 (11th Cir. 2001) (holding clemency board members' absence from clemency meeting and their appearance of impropriety did not violate Due Process Clause).

Here, Barwick argues that the State violated his due-process rights because it did not provide any standards that would govern the clemency decision. But under our binding precedent, we cannot agree that the Due Process Clause requires the State to provide any such standards.

An initial problem with Barwick's argument about the State's lack of standards is that it runs counter to Supreme Court authority, which has explained that "[i]t is not for the Judicial Branch to determine the standards" for the executive's clemency discretion. *Cavazos v. Smith*, 565 U.S. 1, 9 (2011) (per curiam). Any grievances that "the clemency power is exercised in either

too generous or too stingy a way" must be resolved by "political correctives, not judicial intervention." *Id.*  While *Cavazos* was decided under different circumstances and therefore does not squarely control the outcome here, its discussion bears on whether the Constitution imposes the requirement for clemency standards that Barwick seeks.

With respect to the Due Process Clause's effect on clemency proceedings, the controlling opinion in *Woodard* is clear that the clemency process is only subject to "*minimal* procedural safeguards."  *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring in part and concurring in the judgment).  And the only tangible examples of due-process violations that the Supreme Court has set forth include "truly outrageous ones, such as (1) 'a scheme whereby a state official flipped a coin to determine whether to grant clemency,' or (2) 'a case where the State arbitrarily denied a prisoner any access to its clemency process.'"  *Gissendaner*, 794 F.3d at 1331 (quoting *Woodard*, 523 U.S. at 289) (emphasis omitted).

The State's decision to provide the Governor and the Clemency Board with wide discretion to make clemency decisions without tangible standards does not resemble these scenarios that *Woodard* outlines.  That is especially true where, as here, the Commission conducted a clemency interview with Barwick in which Barwick had an opportunity to discuss several potentially mitigating circumstances, including the abuse he suffered during his childhood and the learning challenges he faced in school.

To be sure, the Commissioners also asked several questions about Barwick's criminal history and the facts surrounding the crime that resulted in his death sentence.  But we cannot say that those inquiries suggest that the State's clemency process was arbitrary or otherwise violated the Due Process Clause.  To the contrary, the clemency interview indicates that the Commission

sought to obtain information that would assist the Clemency Board's decision on whether Barwick should receive clemency.

Nor can we agree with Barwick's argument that his clemency proceeding was arbitrary because the Commission allegedly "provided false guidance" when it said it was not concerned with his guilt, but then "myopically focused on [his] crime."

Commissioner Davison told Barwick that the purpose of the clemency interview was "to give [Barwick] an opportunity to make any statements or comments concerning commutation to life of the death sentence imposed." And the interview did that. Barwick, assisted by his counsel, described his life experiences both before his crimes and after his incarceration. Following his presentation, the Commissioners asked Barwick about his crimes and also about the experiences he described. And they asked about his physical and mental health, including whether he has been diagnosed with any type of brain injury. It is therefore not accurate to suggest that the Commission "myopically focused" on Barwick's crime.

Barwick makes several other arguments about the alleged deficiencies in the State's process here, including that there "was no exploration of [Barwick's] individual characteristics," that "nothing [Barwick] presented was considered because the singular focus of the clemency proceeding concerned the crime itself," and that the "[c]lemency consideration in Barwick's case was essentially nonexistent." But the record does not support his arguments. As we've explained, the Commissioners asked Barwick several questions about his background as well as several questions about his crime. The most reasonable reading of the record here is that the Clemency Board considered Barwick's candidacy for clemency and determined that clemency was not warranted. And we can find no basis to conclude that the Board's determination was arbitrary.

Finally, Barwick argues that he did not know what standards governed his clemency proceeding and he therefore had no opportunity to obtain a different result. We agree with the district court that "[a] more detailed set of criteria would serve a purpose, helping to avoid arbitrariness and unwarranted disparity." But under existing precedent, we cannot conclude that the Constitution requires the State to provide such criteria. Nor can we conclude that additional criteria were likely to change the result here. Ultimately, the Clemency Board retains wide latitude to render its decisions, and judicial review of those decisions is quite limited. *See Bowles*, 934 F.3d at 1242. Any additional information about the relevant factors that are considered in the executive clemency process must come from the political branches, such as the Clemency Board itself.[4]

## IV.    CONCLUSION

Barwick's due-process claim does not have a substantial likelihood of success on the merits. We must therefore deny his motion for a stay of execution pending appeal.

**MOTION FOR A STAY OF EXECUTION PENDING APPEAL DENIED.**

---

[4] We also disagree with Barwick's argument that the district court injected facts outside the record or otherwise abused its discretion. The district court determined that, as a matter of law, Barwick's allegations about the deficiencies in the Florida clemency process could not satisfy the standard articulated in *Woodard*. Its decision did not depend on any assessment of the competence of Barwick's clemency counsel. And Barwick's challenge here is not based on allegations of ineffective assistance from his clemency counsel. *See Bowles*, 943 F.3d at 1242 n.8 ("[G]iven that there is no constitutional right to clemency, there is no constitutional right to effective assistance of counsel in clemency proceedings.").