[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12929-P

_____

D.C. Docket No. 4:19-cv-00319-MW-CAS

GARY RAY BOWLES,

Plaintiff-Appellant,

versus

RON DESANTIS, Governor, in his official capacity,
JIMMY PATRONIS, Chief Financial Officer, in his official capacity,
ASHLEY MOODY, Attorney General, in her official capacity,
NIKKI FRIED, Commissioner of Agriculture, in her official capacity,
JULIA MCCALL, Coordinator, Office of Executive Clemency, in her official
capacity,
MELINDA COONROD, Chairman, Commissioner, Florida Commission on
Offender Review, in her official capacity,
SUSAN MICHELLE WHITWORTH, Commission Investigator Supervisor,
Florida Commission on Offender Review, in her official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

Before ED CARNES, Chief Judge, TJOFLAT, and MARTIN, Circuit Judges.

ED CARNES, Chief Judge:

Gary Ray Bowles is a Florida death row inmate scheduled to be executed on August 22, 2019, at 6:00 p.m.  He has moved for a stay of execution so that we can consider more fully the district court's denial of his motion for a stay of execution.

Bowles sought a stay in the district court in order to pursue his 42 U.S.C. § 1983 claim that the State of Florida interfered with what he views as his right under 18 U.S.C. § 3599 to have attorneys in the Capital Habeas Unit (CHU) of the Federal Public Defender's Office represent him before the Florida Clemency Commission and Board.  Those attorneys had represented Bowles in his federal habeas proceedings and had served as co-counsel, along with state-appointed counsel, in his state collateral proceedings.  The Clemency Commission appointed another attorney to represent Bowles in the clemency proceedings, and that attorney appeared in person at the clemency interview before the Commission.  Even though the CHU attorneys were not allowed to appear in person at the interview, they were repeatedly offered opportunities to submit any written materials they desired in support of clemency.  And they did submit a joint letter from them, state-appointed collateral counsel, and state-appointed clemency counsel urging that clemency be granted.  After holding the interview and

2

considering all of the written materials the Commission submitted a report to the Board, which made the final decision to deny clemency.

The district court denied the motion for a stay of execution because it determined that § 3599 does not create a right that is enforceable against the states. We agree. We also conclude that Bowles has not shown that he is otherwise entitled to a stay of execution from this Court.

## I. FACTS AND PROCEDURAL HISTORY

### A. Bowles' Crimes And Procedural History

In November of 1994 Bowles murdered a man named Walter Hinton by dropping a 40-pound concrete block on his head while Hinton was asleep. See Bowles v. State, 716 So. 2d 769, 770 (Fla. 1998) (Bowles I); Bowles v. State, 804 So. 2d 1173, 1177 (Fla. 2001) (Bowles II). After he was arrested Bowles confessed to the crime. Bowles I, 716 So. 2d at 770. He explained how Hinton had given him a place to stay in his mobile home in Jacksonville, Florida, and how on the night of the murder the two men had been drinking and smoking marijuana. Id. How after Hinton went to sleep Bowles went outside and got the cement stepping stone, brought it inside the mobile home, placed it on a table and "thought for a few moments." Bowles II, 804 So. 2d at 1177 (quotation marks omitted). How he then quietly entered Hinton's bedroom and dropped the stone on Hinton's face, fracturing his face from cheek to jaw. Bowles I, 716 So. 2d at 770; Bowles

3

II, 804 So. 2d at 1181.  How at that point, because Hinton was still alive, he "began to manually strangle [Hinton]," and put a rag in his mouth to smother him to death. Bowles I, 716 So. 2d at 770.  The only thing Bowles left out of his confession "was how he [also] stuffed toilet paper" down Hinton's throat.  Bowles II, 804 So. 2d at 1181.

After Hinton was dead, Bowles went out.  Id.  He drove to get some liquor, then picked up a woman on the beach and brought her back to Hinton's home.  Id. He made sure to keep her away from the room where Hinton's dead body lay covered in sheets.  Id.  Bowles was arrested approximately six days later, after having been "seen driving Hinton's car and wearing Hinton's watch."  Id. at 1180– 81.

Bowles pleaded guilty to first degree murder and a jury recommended that he be sentenced to death, which the trial court did.  Id. at 1175.  The Florida Supreme Court affirmed the conviction but vacated the death sentence because of an evidentiary error at the original sentence proceeding.  Bowles I, 716 So. 2d at 773.  On remand, a jury unanimously recommended death and the trial court again imposed that sentence.  Bowles II, 804 So. 2d at 1175.  This time the Florida Supreme Court affirmed.  Id. at 1184.

Bowles' killing of Hinton was no isolated incident, and the sentencing court "assigned tremendous weight to the prior violent capital felony convictions."  Id. at

4

1175.  In 1982 Bowles had "brutally attacked" his girlfriend, leaving her with

"contusions to her head, face, neck, and chest, as well as bites to her

breasts . . . [and] internal injuries including lacerations to her vagina and rectum."

Id.  For that Bowles was convicted of sexual battery and aggravated sexual battery.

Id.

Bowles was released from prison in April of 1990.  In July 1991, just over a

year after getting out, he was convicted of robbery for pushing a woman down and

stealing her purse.  Id. at 1175–76.  For that crime he was sentenced to four years

in prison followed by six years of probation.  Id. at 1175.  While out on probation

in 1994, Bowles committed three murders.

The first murder was of John Roberts on March 14, 1994.[1]  Roberts made

the same mistake that Hinton would later make.  He was kind to Bowles, letting

him move into his home.  Bowles II, 804 So. 2d at 1176.  A few days after doing

so: "Bowles approached [Roberts] from behind and hit him with a lamp.  A

---

[1]  The Florida Supreme Court decisions do not mention the names of Bowles' other victims, the exact dates of their deaths, or Bowles' sentences for committing the murders.  We have gleaned that information from the dockets for those consolidated cases.  See Certified Copies of Prior Convictions, State v. Bowles, No. 1994 036050 CFAES/1996 036260 CFAES (Fla. 7th Cir. Ct. Aug. 6, 1997), Doc. No. 169 (containing certified copies of indictments and judgments); see also Florida Department of Corrections, Gary Ray Bowles, Corrections Offender Network, http://www.dc.state.fl.us/offenderSearch/detail.aspx?Page=Detail&DCNumber=086158&TypeSearch=AI (last updated Aug. 11, 2019).  In keeping with Eleventh Circuit Internal Operating Procedure 10, "Citation to Internet Materials in an Opinion," under Federal Rule of Appellate Procedure 36, a copy of the internet materials cited in this opinion is available at this Court's Clerk's Office.

5

struggle ensued during which Bowles strangled [Roberts] and stuffed a rag into his mouth. Bowles then emptied the victim's pockets, took his credit cards, money, keys, and wallet." Id.

Two months later another person, Albert Morris, fell prey to Bowles. Like Roberts before him (and Hinton after him), Morris "befriended Bowles and allowed Bowles to stay at his home." Id. at 1176. Bowles and Morris "got into an argument and a fight outside of a bar." Id. Bowles hit him "over the head with a candy dish, and a struggle ensued, resulting in [Morris] being beaten and shot. Bowles also strangled [Morris] and tied a towel over his mouth." Id.[2]

Then in November of that same year Bowles murdered Walter Hinton. We have already discussed the details of that brutal crime. See supra at 3–4. In addition to murdering Hinton, Roberts, and Morris, Bowles apparently murdered three other victims.[3]

After the Florida Supreme Court affirmed Bowles' conviction and death sentence for murdering Hinton, he unsuccessfully sought post-conviction relief in state post-conviction proceedings, Bowles v. State, 979 So. 2d 182 (Fla. 2008), and

---

[2] For the murder of Roberts, Bowles was sentenced in 1996 to life in prison. For the murder of Morris, in 1997 he was also sentenced to life in prison.

[3] In a state post-conviction proceeding in connection with an ineffective assistance of counsel claim, Bowles was evaluated by a clinical psychologist. That psychologist testified "that Bowles told him that 'it bothers him [that] he killed six people who probably didn't deserve to die.'" Bowles v. State, 979 So. 2d 182, 187 (Fla. 2008) (alteration in original) (emphasis added). Not three, but six.

in federal habeas proceedings, Bowles v. Sec'y for Dep't of Corr., 608 F.3d 1313 (11th Cir. 2010). Last year the Florida Supreme Court denied another motion for post-conviction relief; in that motion Bowles claimed that he was entitled to have his death sentence vacated based on the Supreme Court's decision in Hurst v. Florida, 136 S. Ct. 616 (2016). See Bowles v. State, 235 So. 3d 292, 292–93 (Fla. 2018).

Bowles filed another successive post-conviction motion in Florida state court on October 19, 2017, raising for the first time an intellectual disability claim. The Florida Supreme Court affirmed the denial of that motion on August 13, 2019. Bowles v. State, Nos. SC19-1184 & SC19-1264, 2019 WL 3789971, at *2–3, 4 (Fla. Aug. 13, 2019). It also denied Bowles' habeas petition in which he claimed that the death penalty is cruel and unusual punishment barred by the Eighth Amendment of the United States Constitution. Id. at *3–4.

## B. Federal Appointment Of Counsel

In September 2017 the federal district court that had denied Bowles' § 2254 petition in December 2009 granted his motion to appoint under 18 U.S.C. § 3599(a)(2) CHU attorneys to serve as Bowles' new federal habeas counsel. See Order, Bowles v. Sec'y, Fla. Dep't of Corr., No. 3:08-cv-791 (M.D. Fla. Sept. 27, 2017), ECF No. 33. The court also granted Bowles' motion to permit the CHU attorneys to represent him as co-counsel in Florida state court in connection with

7

Bowles' motion for post-conviction relief based on intellectual disability.  See

Order, Bowles v. Sec'y, Fla. Dep't of Corr., No. 3:08-cv-791 (M.D. Fla. Dec. 6,

2017), ECF No. 36.  The CHU attorneys served as co-counsel with state-appointed

counsel in those proceedings.  See Bowles, 2019 WL 3789971.[4]

## C.  State Clemency Proceedings

While Bowles' intellectual disability claim was proceeding in the Florida

courts, the Governor of Florida, through the Florida Commission on Offender

Review, began clemency proceedings for Bowles.  Under Florida law the clemency

power is vested in the executive branch, and exercise of that power is purely

discretionary.  See Fla. Const. Art. IV, § 8(a).

The Governor and members of his cabinet make up the Clemency Board,

which is responsible for promulgating the "Rules of Executive Clemency."  One of

those rules, Rule 15, governs the "Commutation of Death Sentences."  Under that

Rule, the Florida Commission on Offender Review (which is separate from the

Board) "may conduct a thorough and detailed investigation into all factors relevant

to the issue of clemency and provide a final report to the Clemency Board."  Fla.

R. Clemency 15(B).  That investigation is to include an interview of the inmate by

the Commission.  He is allowed to have clemency counsel present at the interview.

---

[4] We do not, as our concurring colleague suggests, "[u]nderstand 18 U.S.C. § 3599 to authorize federally appointed (and federally paid) habeas counsel to appear in state proceedings." At least, not in all state proceedings and not in all circumstances.  See infra at 26 n.9.

8

Id.  By statute, the Board "may" in its "sole discretion" appoint the clemency counsel; the Board must maintain a list of private counsel who are available for that purpose.  Fla. Stat. § 940.031.  But the statute "does not create a statutory right to counsel in such proceedings."  Id.

Once the Commission completes its investigation, it sends a report to the Board.  Fla. R. Clemency 15(D).  The Board then may, but is not required to, hold a clemency hearing, at which "the inmate's clemency counsel and the attorneys for the state may make an oral presentation, each not to exceed 15 minutes collectively."  Id. at (H).  Then the Board votes on whether to grant clemency.  Only after "the executive clemency process has concluded" may the Governor issue a death warrant.  Fla. Stat. § 922.052.

In this case, the Commission began clemency proceedings for Bowles in March of 2018.  It appointed Nah-Deh Simmons, a private practitioner, as Bowles' clemency counsel.  Simmons had not represented Bowles before, nor did he already know when he was first appointed that Bowles had brought an intellectual disability claim that was pending in state court.  On March 26, 2018, the Commission notified Bowles that Simmons would be representing him and that a clemency interview had been set for August 2, 2018.  Two days later an investigator for the Commission wrote to one of the CHU attorneys inviting them

9

"as the post-conviction counsel" for Bowles to submit written comments to the Commission.

On June 21, 2018, the CHU attorneys, attorney Simmons, and Bowles' state-appointed attorney in his post-conviction proceedings jointly submitted a six-page, single-spaced letter to the Clemency Board.  In that letter, they informed the Board of the intellectual disability claim that Bowles was pursuing in state court and asked the Board to postpone the clemency proceeding until after that claim had been resolved.  Their letter also included information about Bowles' traumatic childhood and his history of substance abuse.  It stated that "[b]ecause of the pending litigation in the Circuit Court on his intellectual disability claim, the narrative of [Bowles'] life cannot be further expanded on at this time."  The letter asked that  Bowles' sentence be commuted to life imprisonment without parole.

The CHU attorneys also contacted the Governor's office directly to request postponement of Bowles' clemency interview in light of the fact that he had an intellectual disability claim pending in state court.  That request was denied on June 22, 2018.  The Governor's office explained: "The clemency process is wholly separate and distinct from the successive legal challenges to [Bowles'] death sentence[], and inmate Bowles has been appointed separate legal counsel to represent him in the clemency proceedings.  You are welcome to submit any materials in support of inmate Bowles' request for clemency, which will be given

10

full consideration." The CHU attorneys did not submit any materials in response to that second invitation to do so. According to Bowles' complaint in this case, Simmons interpreted the response from the Governor's office "to mean that 'the Board will only consider communications from [him],'" not from the CHU attorneys.

The CHU attorneys then assisted Simmons in preparing for Bowles' interview before the Commission, which was still set for early August, a little over a month away. During that month the CHU attorneys remained in contact with Simmons, helping him prepare for Bowles' clemency interview. They also planned to participate in that interview so that they could, in their words, protect Bowles' "rights as they pertained to his ongoing intellectual disability litigation" and provide the Commission "a full picture of . . . Bowles'[] life history and intellectual disability." But on July 24 Simmons received a phone call from the Commission "informing him that neither [the CHU attorneys] nor [the CHU's expert witness] would be allowed to attend or participate in the clemency presentation." Only Simmons, as the duly appointed clemency counsel, would be permitted to do so. The CHU attorneys asked the Commission to reconsider that decision and allow them to appear at the clemency interview, but the Commission denied that request. In doing so, the Commission again emphasized that "[a]ny party is welcome to submit any materials in support of inmate Bowles' request for

11

clemency, which will be given full consideration." The CHU attorneys did not submit any more materials in response to that third invitation.

Bowles' clemency interview occurred on August 2, 2018 as planned. Bowles was present along with his clemency counsel, Simmons, who gave a presentation to the Commission, arguing for clemency. No attorney from the CHU was present. The interview lasted about an hour-and-a-half. The next month the CHU attorneys submitted a letter to the Clemency Board asking that a supplemental clemency interview be conducted by the Commission and the Board (which had not conducted or participated in the first one) at which the CHU attorneys could represent Bowles. Their letter asserted that Bowles' federal rights under 18 U.S.C. § 3599 had been abridged because the Commission had not allowed his § 3599 counsel (the CHU attorneys) to represent him at the clemency interview. The letter went unanswered.

On June 11, 2019, Simmons received a letter from the Board stating that the Governor had denied Bowles' request for clemency and had signed a death warrant. Bowles' execution is set for August 22, 2019.

### D.  Bowles' § 1983 Claim And Motion To Stay

On July 11, 2019, a month after the Governor denied him clemency and signed the death warrant, Bowles filed a complaint in federal district court seeking declaratory and injunctive relief under 42 U.S.C. § 1983. Seven members or

12

agents of the Clemency Board, including the Governor and the Attorney General, were named as Defendants.  The complaint asserts that Bowles' state-appointed counsel did not, "and could not, give a meaningful clemency presentation [because of] his lack of experience in death penalty litigation, lack of training regarding intellectual disability, lack of familiarity with [the] case, and lack of resources to investigate and present experts to educate [the Commission] about intellectual disability as it applied to [Bowles]."  The claim is that by refusing to allow his federally appointed counsel to participate more fully in the clemency process, the defendants had violated his "federal statutory right to representation by adequate counsel in state clemency proceedings under 18 U.S.C. 3599."  (Emphasis added).[5]

The relief requested includes: (1) a declaratory judgment that the defendants "interfered with his federal right, in the absence of adequate, similarly qualified replacement counsel, to be represented in clemency proceedings by his existing counsel appointed under 18 U.S.C. § 3599," and (2) a "permanent injunction, barring Defendants from executing him until a clemency proceeding occurs that complies with federal law."  Bowles also moved in the district court for an emergency stay of execution.

---

[5]  In his reply brief in support of his motion to stay in the district court, Bowles clarified that he was not asserting that the defendants violated his rights under the Due Process Clause or the Sixth Amendment, and his only claim for relief was that the defendants "violated his federal statutory right, codified in § 3599, to representation by his appointed federal counsel."

13

The district court denied Bowles' motion for a stay on July 19, 2019.  The court explained that for a statute to create a federal right enforceable through § 1983 it must impose a binding obligation on the states.  And because § 3599 does not, the court concluded, Bowles cannot establish a substantial likelihood of success on the merits and his motion for a stay necessarily fails.  Bowles appealed that order on August 1, 2019 and has moved this Court for an emergency stay of execution "so that the appeal of the denial of a stay in his 42 U.S.C. § 1983 action can be considered."

## II.  STANDARD OF REVIEW

"[A] stay of execution is an equitable remedy and all of the rules of equity apply."  Long v. Sec'y, Dep't of Corr., 924 F.3d 1171, 1176 (11th Cir. 2019).  We may grant a stay of execution "only if the movant establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest."  Id.; see also Powell v. Thomas, 641 F.3d 1255, 1257 (11th Cir. 2011).

## III.  DISCUSSION

### A.  Substantial Likelihood Of Success On The Merits

The first requirement for a stay pending appeal is that the movant must establish a substantial likelihood of success on the merits of his appeal.  For

14

Bowles that means he must have shown a substantial likelihood that the district court abused its discretion when it denied his motion for a stay because it is the denial of that stay he is appealing.  See Brooks v. Warden, 810 F.3d 812, 818 (11th Cir. 2016) ("[W]e review the denial of a stay of execution only for an abuse of discretion.").  It's a request for a stay pending appeal in order to more fully review the district court's denial of a stay to give that court more time to decide the merits of Bowles' § 1983 claim based on the § 3599 issue he raises.

The district court denied Bowles' motion for a stay because it concluded that he had not shown a substantial likelihood of success on the merits of his underlying claim.  The underlying claim was that he had an enforceable right under § 1983 to have his § 3599 counsel represent him in the state clemency proceeding more fully than they were allowed to do.  The district court was not persuaded that Congress had created a right enforceable against the states when it provided in § 3599 for the appointment of federal counsel to represent capital defendants seeking federal habeas relief.

Section 1983 provides a private cause of action against any person who, under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law."  Blessing v. Freestone,

15

520 U.S. 329, 340 (1997).  The first thing we do in determining whether a statute confers a federal right enforceable under § 1983 is "identify[] 'exactly what rights, considered in their most concrete, specific form, [plaintiff] [is] asserting.'"  Burban v. City of Neptune Beach, 920 F.3d 1274, 1278 (11th Cir. 2019) (some alterations in original) (quoting Blessing, 520 U.S. at 342).  Bowles has specified that the right he asserts is the purported right under § 3599 to have his federal counsel represent him in state clemency proceedings instead of being "forced . . . to proceed with inadequate counsel."[6]

---

[6] Bowles says that his § 3599 counsel was not allowed to represent him in the clemency proceedings, but that's not quite accurate.  As Bowles' complaint notes, the Clemency Commission reached out to his CHU attorneys and invited them to submit comments and materials to the Commission.  Those attorneys did so, submitting a six-page letter with information about Bowles' traumatic childhood and history of substance abuse.  They also stated that "[b]ecause of the pending litigation in the Circuit Court on his intellectual disability claim, the narrative of [Bowles'] life cannot be further expanded on at this time."  That perceived difficulty was not, of course, caused by the CHU attorneys not being appointed clemency counsel.

The CHU attorneys were also invited two more times to submit information to the Commission.  The first was when the Governor's office rejected their request to reschedule Bowles' clemency interview.  The Governor's office told the CHU attorneys: "You are welcome to submit any materials in support of inmate Bowles' request for clemency, which will be given full consideration."  The other additional invitation (which was the third one in all) came when the Commission denied the CHU attorneys' request to appear at the clemency interview.  In doing so, it again stressed that "[a]ny party is welcome to submit any materials in support of inmate Bowles' request for clemency, which will be given full consideration."

The CHU attorneys never submitted any more materials in response to those additional invitations.  And Bowles does not claim that the Commission did not consider the letter that they had submitted or that it prevented them from submitting any other information or materials.  The sum total of his claim appears to be that at the hour-and-a-half long clemency interview on August 2, 2018, Bowles should have been represented by the CHU attorneys instead of by the clemency attorney the Commission had appointed.

16

Having identified the alleged right, we "look at the text and structure of [the] statute in order to determine if it unambiguously provides" that specific right. 31 Foster Children v. Bush, 329 F.3d 1255, 1270 (11th Cir. 2003). In making that determination, we consider the three Blessing requirements to decide if that purported right is enforceable under § 1983. See Blessing, 520 U.S. at 340. Only if all three requirements are met will a rebuttable presumption arise that the right exists and is enforceable. See Burban, 920 F.3d at 1279; 31 Foster Children, 329 F.3d at 1269 (characterizing the Blessing factors as "requirements that must be met before a federal statute will be read to confer a right enforceable under § 1983"). Those three requirements are that: (1) "Congress must have intended that the provision in question benefit the plaintiff," (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence," and (3) "the statute must unambiguously impose a binding obligation on the States." Blessing, 520 U.S. at 340–41 (quotation marks omitted). We will begin by examining more closely the statute Bowles relies on.[7]

---

[7] We note, as the district court did, that other "courts have considered whether an attorney appointed pursuant to section 3599 was authorized [by a federal court] to represent the defendant for a particular purpose, but not whether the defendant was entitled as a matter of federal law to have that attorney appear at a particular proceeding." Doc. 25 at 7–8 (emphasis added). Compare, e.g., Samayoa v. Davis, 928 F.3d 1127, 1132 (9th Cir. 2019) (holding that "state provisions for clemency counsel do not bar the appointment of additional counsel under § 3599 for purposes of state clemency proceedings"), with Irick v. Bell, 636 F.3d 289, 291 (6th Cir. 2011) (holding that § 3599 does not "obligate the federal government to pay for counsel in

1. 18 U.S.C. § 3599

Section 3599 provides funding for representation.  It "authorizes federal

courts to provide funding to a party who is facing the prospect of a death sentence

and is 'financially unable to obtain adequate representation or investigative, expert,

or other reasonably necessary services.'"  Ayestas v. Davis, 138 S. Ct. 1080, 1092

(2018) (quoting 18 U.S.C. § 3599(a)).  Congress enacted this authorization for the

funding of counsel and other legal services when it passed the Anti-Drug Abuse

Act of 1988, which created a federal capital offense of drug-related homicide.  See

Pub. L. No. 100-690, § 7001, 102 Stat. 4181 (codified originally at 21 U.S.C.

§§ 848(q)(4)-(10), then re-codified without change at 18 U.S.C. § 3599); Harbison

v. Bell, 556 U.S. 180, 190 (2009).  Congress did not limit this funding

authorization to representation of defendants charged in federal court with a capital

---

state [clemency] proceeding where the state itself has assumed that obligation").  Authorization to appear (and be paid) if allowed is one thing, right to appear instead of, or in addition to, state-appointed counsel is another.  None of the § 3599 authorization decisions, as far as we can tell, were brought under § 1983 or sought the right to appear in a state clemency proceeding where the state provides other counsel.

By noting that distinction and by focusing on whether Bowles had a right to have his federally appointed counsel appear in the state clemency proceedings, we do not mean to imply that § 3599 obligates or even authorizes a federal district court to appoint federal counsel to appear in state clemency proceedings where the State has already appointed counsel for that purpose.  That question is simply not before us.  Nor was it before the Supreme Court when it held that "§ 3599 authorizes federally appointed counsel to represent their clients in state clemency proceedings and entitles them to compensation for that representation."  Harbison v. Bell, 556 U.S. 180, 194 (2009); cf. id. at 189 (noting that § 3599(a)(2) "provides for counsel only when a state petitioner is unable to obtain adequate representation").

18

crime; it also extended it to state death row inmates seeking habeas relief in federal court.

Under § 3599(a)(2), the provision applicable to state death row inmates, a prisoner seeking collateral relief in federal court "shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f)." Subsections (b) through (d) set the qualifications that counsel must meet to be appointed, and subsection (e) "sets forth counsel's responsibilities." Harbison, 556 U.S. at 185. That subsection provides:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings . . . and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

18 U.S.C. § 3599(e) (emphasis added). Subsections (f) and (g) address when a court may authorize the defendant's attorneys to obtain other services on his behalf and how the attorneys will be paid for their services. Id. § 3599(f), (g).

## 2. The Intended Benefit?

With that brief overview we move now to the first Blessing requirement: whether Congress intended for the provision in question to benefit Bowles. Blessing, 520 U.S. at 340. The Supreme Court has explained that when Congress

19

intends for a provision to benefit specific individuals, it will use "rights-creating" language that is "individually focused," Gonzaga Univ. v. Doe, 536 U.S. 273, 287 (2002), and "phrased in terms of the persons benefited," id. at 284 (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 692 n.13 (1979)).  Title VI of the Civil Rights Act of 1964 is a good example.  See Gonzaga, 536 U.S. at 284.  Title VI very specifically provides: "No person . . . shall . . . be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The right created is clear (not to be subject to discrimination by a program receiving federal funds), and it is equally clear who is obligated to respect that right ("any program or activity receiving Federal financial assistance").

In Gonzaga, the Supreme Court contrasted Title VI's "unmistakable focus on the benefited class," id. at 284 (emphasis and quotation marks omitted), with the statute that was before it: the Family Education Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g.  In FERPA Congress instructed the Secretary of Education that "[n]o funds shall be made available . . . to any [school] which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ."  20 U.S.C. § 1232g(b)(1).  The Court determined that this language did not "confer the sort of individual entitlement that is enforceable under § 1983" because the provisions spoke "only to the Secretary of Education" and the provisions' focus was "two steps removed

20

from the interests of individual students and parents." Gonzaga, 536 U.S. at 287 (quotation marks omitted).

Here, some provisions of § 3599 do contain the kind of individually focused language that indicates that Congress may have intended the statute to benefit certain individuals. Under subsection (a)(2), for example, it is the individual "defendant" who "shall be entitled to the appointment of one or more attorneys and the furnishing of such other services" as other subsections allow. 18 U.S.C. § 3599(a)(2). That could indicate that Congress intended to benefit capital defendants by entitling them to the appointment of counsel and other services.

But that's not the end of the analysis. Even if § 3599 creates some kind of private entitlement, we must still ensure that it compels the specific "right the plaintiff seeks to vindicate as opposed to some other right." Burban, 920 F.3d at 1280; see Blessing, 520 U.S. at 340 (explaining that our focus is whether the "provision in question" benefits the plaintiff) (emphasis added). The right Bowles seeks to vindicate is not the appointment or compensation of counsel but the right to have his federally appointed counsel appear at a state clemency interview where the State has appointed another attorney to do so. Nowhere in § 3599 did Congress "speak[] with a clear voice" that a state death row inmate has an individual right to have his § 3599 counsel, instead of or in addition to some other counsel, represent

21

him in a state clemency proceeding against the State's wishes.  See Gonzaga, 536 U.S. at 280.

As Bowles sees it, § 3599(e) defines the scope of his right and embodies a mandate from Congress that his § 3599 appointed attorney "shall also represent" him in any "proceedings for executive or other clemency as may be available."  18 U.S.C. § 3599(e).  Therefore, according to Bowles, Congress has created an individual right for him to have his attorney appear in any state clemency proceedings, regardless of the rules that the State normally applies to those proceedings.  And unless that right is honored, he insists, the state court judgment conferring his death sentence cannot be carried out.

We do not believe that Congress intended to include such an expansive right, coupled with such a drastic remedy, in such an innocuously worded statute.  After all, "[i]t is beyond dispute that [federal courts] do not hold a supervisory power over the courts of the several States."  Dickerson v. United States, 530 U.S. 428, 438 (2000); see Harris v. Rivera, 454 U.S. 339, 344–45 (1981) ("Federal judges have no general supervisory power over state trial judges; they may not require the observance of any special procedures except when necessary to assure compliance with the dictates of the Federal Constitution."); Smith v. Phillips, 455 U.S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional

22

dimension."). It would be a radical departure from the norm for lower federal courts, or Congress, to tell state courts what to do in state proceedings, including which lawyers they must permit to appear before them in those proceedings.

And that is, if anything, especially true of state clemency proceedings. Clemency is "the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." Herrera v. Collins, 506 U.S. 390, 412 (1993). It is undisputed that there is no constitutional right to clemency. Id. at 414. It is instead a discretionary remedy that is "granted 'as a matter of grace.'" Valle v. Sec'y, Fla. Dep't of Corr., 654 F.3d 1266, 1268 (11th Cir. 2011) (quoting Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 280–81 (1998)). Over that discretionary act of state executive officials, the federal judiciary exercises very little, if any, oversight. See Woodard, 523 U.S. at 289 (O'Connor, J., concurring) ("[J]udicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process."); Wellons v. Comm'r, Ga. Dep't of Corr., 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (per curiam) (recognizing Justice O'Connor's concurring opinion in Woodard as "set[ting] binding precedent").[8]

---

[8] To the extent Bowles complains that his state-appointed counsel did not do a good enough job representing him in the state clemency proceedings, the right to have a more effective attorney represent him than the one who did is even further removed from the language of

23

Not only that, but as the district court pointed out, "it is questionable" whether the kind of interference in state clemency processes that Bowles says § 3599 provides would even be constitutionally permissible. Cf. Hoover v. Ronwin, 466 U.S. 558, 569 n.18 (1984) (explaining that regulation of the bar is an important "sovereign function" of state government linked to the power to protect the public). That is another reason not to interpret § 3599 in the way Bowles urges. See Clark v. Martinez, 543 U.S. 371, 380–81 (2005) (stating that statutes should be construed to avoid constitutional questions if fairly possible to do so); Hooper v. California, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). At the very least, the intrusion of federal courts into state clemency proceedings would "aggravate the harm to federalism that federal habeas review" already causes. Davila v. Davis, 137 S. Ct. 2058, 2070 (2017); see also id. ("Federal habeas review of state convictions entails significant costs and intrudes

---

§ 3599. And given that there is no constitutional right to clemency, there is no constitutional right to effective assistance of counsel in clemency proceedings. Cf. Coleman v. Thompson, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted); Murray v. Giarratano, 492 U.S. 1, 11 (1989) ("[P]risoners seeking judicial relief from their sentence in state proceedings [are] not entitled to counsel."); Chavez v. Sec'y, Fla. Dep't of Corr., 742 F.3d 940, 944 (11th Cir. 2014) ("The Supreme Court has long held that there is no constitutional right to counsel in post-conviction proceedings, even in capital cases, which necessarily means that a habeas petitioner cannot assert a viable, freestanding claim for the denial of the effective assistance of counsel in such proceedings.").

24

on state sovereignty to a degree matched by few exercises of federal judicial authority.") (citations and quotation marks omitted).  And as we have discussed, federal courts have never exercised supervisory power over state courts and may not intervene in these proceedings except to prevent or remedy constitutional violations.  See supra at 22–23.

When legislating against that backdrop, if Congress intends to allow federal interference into areas traditionally reserved to the states, it speaks clearly and unequivocally.  See, e.g., 28 U.S.C. § 2251(a)(1) (explicitly granting "[a] justice or judge of the United States before whom a habeas corpus proceeding is pending" the authority to "stay any proceeding against the person detained in any State court or by or under the authority of any State for any matter involved in the habeas corpus proceeding"); id. § 2251(a)(3) (explicitly authorizing court to grant stay to allow for appointment of counsel under § 3599(a)(2)).  There is nothing in § 3599 to indicate that Congress meant to empower Bowles' federally appointed and funded counsel to force themselves into state clemency proceedings.

A more natural reading of § 3599 is that all it does is what it says it does.  Subsection (a) entitles defendants to the appointment of counsel and to the furnishing of certain other services.  The other subsections explain just what that appointment and the furnishing of those services entails, including funding.  No part of § 3599 states that appointed counsel have the right to appear in state

25

clemency proceedings where the State has provided other counsel.  It is telling that every decision the parties rely on in which a court has interpreted § 3599 concerns when a federal district court has the authority to appoint counsel or approve the funding of other services — not whether federally appointed counsel can force their way into proceedings in which they would otherwise not be allowed and where there is already state-appointed counsel.[9]  Congress may have created other rights in § 3599, but we are not persuaded that it intended to give Bowles the specific and extraordinary right he claims.

### 3. Intended Enforcement?

Our conclusion is reinforced by consideration of the second Blessing requirement: whether the "right assertedly protected by the statute" is "so vague and amorphous" that its enforcement would "strain judicial competence."

---

[9] E.g., Ayestas, 138 S. Ct. at 1085 (resolving in § 2255 appeal question of what standard courts must use to grant or deny funding under § 3599(f)); Harbison, 556 U.S. at 194 (holding that § 3599 authorizes a district court to appoint and fund counsel to represent defendant in state clemency proceedings); McFarland v. Scott, 512 U.S. 849, 855–57 (1994) (holding that the right to appointed counsel in federal habeas proceedings "adheres prior to the filing of a formal, legally sufficient habeas corpus petition"); Lugo v. Sec'y, Fla. Dep't of Corr., 750 F.3d 1198, 1213–14 (11th Cir. 2014) (noting that "it would be an abuse of discretion for a district court to appoint federal habeas counsel to assist a state prisoner in exhausting his state postconviction remedies before a formal § 2254 petition has been filed"); Gary v. Warden, Ga. Diagnostic Prison, 686 F.3d 1261, 1277–79 (11th Cir. 2012) (holding that § 3599 does not provide for the federal appointment and funding of counsel to bring a new state court post-conviction proceeding unrelated to any federal claim); King v. Moore, 312 F.3d 1365, 1368 (11th Cir. 2002) (holding that a state prisoner is not entitled to federally funded counsel for the purpose of pursuing state post-conviction remedies); In re Lindsey, 875 F.2d 1502, 1506 (11th Cir. 1989) (holding that the right to federally appointed counsel does not encompass "any proceedings convened under the authority of a State").

26

Blessing, 520 U.S. at 340–41 (quotation marks omitted).  As we construe it, § 3599 is sufficiently definite that our judicial competence is not strained.  We are routinely confronted with questions of whether the statute authorizes the appointment of counsel or the furnishing of other funding in this or that circumstance.  See, e.g., Lugo v. Sec'y, Fla. Dep't of Corr., 750 F.3d 1198, 1213–14 (11th Cir. 2014) (noting that it would be an abuse of discretion for a district court "to appoint federal habeas counsel to assist a state prisoner in exhausting his state postconviction remedies before a formal § 2254 petition has been filed"); Gary v. Warden, Ga. Diagnostic Prison, 686 F.3d 1261, 1268–69 (11th Cir. 2012) (holding that district court did not abuse its discretion in refusing to authorize federal funds for experts to testify at state clemency hearing).  As a primarily funding statute, there are objective guidelines.

But not if we construe the statute as Bowles would have us.  The statute says nothing about when and how and under what circumstances the provisions of § 3599 are to override state clemency rules and procedures.  We do not think Congress would enact such a far-reaching and intrusive right as the one Bowles asserts without also providing an objective benchmark to measure the extent of that right and gauge how it is to be enforced.  See Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 519 (1990) (holding that obligation imposed on the states by statute was not "vague and amorphous" where the statute set out factors for the state to consider).

27

### 4.  An Intended Obligation on the States?

Finally, even if Congress did enact § 3599 to benefit § 1983 plaintiffs in the way Bowles asserts, and even if we could find clarity in the statute about how to enforce the right Bowles claims, we would still conclude that Congress did not intend for the right to be enforceable through § 1983.  We would because no provision of § 3599, "read individually or together, 'unambiguously impose[s] a binding obligation on the States'" to allow federally appointed counsel to appear in state clemency proceedings where that counsel would not otherwise have a right to appear.  Burban, 920 F.3d at 1279 (alteration in original) (quoting Blessing, 520 U.S. at 341).

A provision unambiguously imposes a binding obligation on the states when it is "couched in mandatory, rather than precatory, terms."  Blessing, 520 U.S. at 341.  Section 3599 does use some mandatory language: defendants "shall be entitled" to the appointment of counsel, and counsel "shall" represent the defendant in certain proceedings, including clemency proceedings.  § 3599(a)(2), (e).  But that language does not even indirectly obligate the states to do anything.  The statute does not say that clemency officials shall or must allow counsel appointed by a federal court under § 3599 to appear and represent the petitioner in a state clemency proceeding.  Instead, as the district court pointed out, the statute "places an obligation on the federal courts to appoint and compensate

28

postconviction counsel for indigent capital defendants," and it "places a binding obligation on the defendant's federally appointed attorney," but at no point does the statute obligate "state courts or executive bodies to allow the federally appointed attorney to appear and practice before them." Doc. 25 at 6–7.

That's true of subsection (e), which specifically lists the state proceedings at which an appointed attorney "shall also" represent the defendant. That subsection does two things. First, it defines the scope of any appointment made under subsections (a)(1) and (a)(2). To the extent the subsection is definitional in nature, that definition "alone cannot and do[es] not supply a basis for conferring rights enforceable under § 1983." See 31 Foster Children, 329 F.3d at 1271. Second, the subsection obligates the attorney to represent his client in certain proceedings, including "proceedings for executive or other clemency as may be available to the defendant." § 3599(e). But the attorney is obligated to do that, and can do that only if he is allowed to do so by the relevant clemency officials. The statute does not obligate any state officials, including clemency officials, to allow an attorney appointed under § 3599 by a federal court to appear in and represent the petitioner in any state proceeding.

Bowles contends to the contrary. He insists that his right to an attorney and the obligation the statute imposes on that attorney to represent him in state clemency proceedings necessarily create a derivative obligation on the State to

29

allow his attorney to appear in that proceeding.  He argues that the right Congress created would be meaningless unless the states had to affirmatively accommodate it.  Cf. McFarland v. Scott, 512 U.S. 849, 859 (1994) (explaining that (1) criminal defendants are entitled to challenge their conviction and sentence in habeas corpus proceedings, (2) Congress has provided "indigent capital defendants with a mandatory right to qualified legal counsel" in those proceedings, and (3) as a result, a stay of execution is sometimes necessary "to give effect to that statutory right" to have appointed counsel file a § 2254 petition on the defendant's behalf).

Not quite.  In § 3599, Congress created a mechanism for the appointment of counsel for certain capital defendants seeking to set aside their convictions or sentences in federal court.  Otherwise, some of them might not be able to obtain counsel.  But because Congress is not in the business of hiding elephants in mouseholes, see Whitman v. Am. Trucking Ass'n, 531 U.S. 467, 468 (2001), we doubt that it meant to use that procedural mechanism to stealthily impose a new set of rules on the states requiring them to treat federally appointed counsel differently than they would treat any other lawyer.  Cf. Younger v. Harris, 401 U.S. 37, 46 (1971) (emphasizing the "fundamental policy against federal interference with state criminal prosecutions").  Under Bowles' interpretation of the statute, does § 3599 also impose an obligation on the states to allow federally appointed counsel to practice in state courts where they are not admitted?  Bowles argues that "[i]n no

30

other context can a state court . . . refuse to hear from a death-sentenced litigant's counsel simply because of the origin of their representation." First, that argument gets things backward. The State appointed counsel for Bowles and allowed that counsel to represent him in the clemency proceedings. It is Bowles who seeks to have a federal court order the State to allow other counsel into a state proceeding "simply because of the origin of their representation." Second, the factual premise of the argument is wrong. The Clemency Commission did not, as he asserts, "refuse to hear from a death-sentenced litigant's counsel." The Commission heard from his state-appointed counsel and his federally appointed counsel were invited three times to submit any written materials they wished, and they did submit a lengthy letter in support of clemency.

As the district court concluded, "[t]o the extent section 3599(e) bears at all on a state's action, it is a precatory statement that the state should allow the defendant's federally appointed counsel to appear in such proceedings." But precatory statements, like implications, are not enough under Blessing. Blessing, 520 U.S. at 341.

Because Bowles seeks to enforce a right under § 1983 that Congress did not make enforceable against the states, he has not shown a substantial likelihood of success on the merits of his § 1983 claim before the district court. For that same

31

reason he has not shown a substantial likelihood of success on his appeal of the district court's denial of his motion to stay his execution.

### B. Other Stay Requirements

Bowles contends that even if he cannot show a substantial likelihood of success on the merits, this Court should still grant him a stay of execution because his lawsuit "presents substantial issues of first impression for this Circuit" and he has made a strong showing on the other three factors. Even if he has, the standard he argues for is not the one the Supreme Court has instructed us to use. Instead, it has held that inmates seeking a stay of execution "must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." Hill v. McDonough, 547 U.S. 573, 584 (2006) (emphasis added).

And that has long been our rule. See Brooks, 810 F.3d at 818 ("It is by now hornbook law that a court may grant a stay of execution only if the moving party establishes that: (1) he has a substantial likelihood of success on the merits . . . .") (quotation marks omitted); Jones v. Comm'r, Ga. Dep't of Corr., 811 F.3d 1288, 1292 (11th Cir. 2016) ("It is by now axiomatic that a court may grant a stay of execution only if the moving party establishes that: (1) he has a substantial likelihood of success on the merits . . . .") (emphasis added) (quotation marks omitted); Gissendaner v. Comm'r, Ga. Dep't of Corr., 779 F.3d 1275, 1280 (11th Cir. 2015) (stating that a stay of execution "is appropriate only if the moving party

32

establishes <u>all</u> of the" traditional elements for granting a stay) (emphasis added); <u>Powell</u>, 641 F.3d at 1257 ("This Court may grant a stay of execution <u>only</u> if the moving party shows that: (1) he has a substantial likelihood of success on the merits . . . .") (emphasis added).

For that reason, we have often declined to consider the remaining stay requirements when an inmate has not shown a substantial likelihood of success on the merits. <u>See</u> <u>Mann v. Palmer</u>, 713 F.3d 1306, 1310 (11th Cir. 2013) ("Because [the defendant] cannot establish a substantial likelihood of success on the merits of his complaint, we deny [his] motion for a stay of execution."); <u>Valle v. Singer</u>, 655 F.3d 1223, 1225 (11th Cir. 2011) (per curiam) ("Because [the defendant] has failed to show a substantial likelihood of success on the merits, we need not address the other three requirements for issuance of a stay of execution."); <u>DeYoung v. Owens</u>, 646 F.3d 1319, 1328 (11th Cir. 2011) ("[The defendant] has not demonstrated a substantial likelihood of success on the merits of his claims. Therefore, the Court denies [his] motion for a stay of execution in this Court.").

Second, the balance of the equities does not weigh in Bowles' favor anyway. Specifically, he has not shown that "the injunction would not substantially harm the other litigant" or that "the injunction would not be adverse to the public interest." <u>Long</u>, 924 F.3d at 1176. The Supreme Court has repeatedly recognized that "equity must be sensitive to the State's strong interest in enforcing its criminal

33

judgment without undue interference from the federal courts." Hill, 547 U.S. at 584; see Nelson v. Campbell, 541 U.S. 637, 650 (2004) (recognizing "the State's significant interest in enforcing its criminal judgments"); In re Blodgett, 502 U.S. 236, 239 (1992) (noting that a stay prevents a state "from exercising its sovereign power to enforce the criminal law"); Gomez v. U.S. Dist. Ct. of N. Dist. of Cal., 503 U.S. 653, 654 (1992) (per curiam) ("Equity must take into consideration the State's strong interest in proceeding with its judgment . . . ."); McCleskey v. Zant, 499 U.S. 467, 493 (1991) (recognizing the "State's interest in the finality of its criminal judgments"). As the Supreme Court has explained: "Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out. To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." Calderon v. Thompson, 523 U.S. 538, 556 (1998) (citations and quotation marks omitted).

We have also long emphasized the "the State's and the victims' interests in the finality and timely enforcement of valid criminal judgments." Ledford v. Comm'r, Ga. Dep't of Corr., 856 F.3d 1312, 1320 (11th Cir. 2017); see Arthur v. King, 500 F.3d 1335, 1340 (11th Cir. 2007) (per curiam) ("The strong interest of the State and the victims'[] families is in the timely enforcement of a sentence,

34

which acquires an added moral dimension once post-trial proceedings finalize.")
(citation and quotation marks omitted); Williams v. Allen, 496 F.3d 1210, 1214
(11th Cir. 2007) (noting that "[b]oth the State and the victim's family have a strong
interest in the timely enforcement of [the defendant's] death sentence," and
explaining that an entry of a stay would grant the defendant a "reprieve from his
judgment").  And we have rejected the argument that "the equities favor a stay
because [the defendant] will suffer irreparable harm if he is executed, whereas the
state will only suffer [a] minimal inconvenience," because "the state, the victim,
and the victim's family also have an important interest in the timely enforcement
of [the defendant's] sentence."  Brooks, 810 F.3d at 825–26 (quotation marks
omitted).

So while "neither [the State] nor the public has any interest in carrying out
an execution" based on a defective conviction or sentence, see Ray v. Comm'r,
Ala. Dep't of Corr., 915 F.3d 689, 702 (11th Cir. 2019), "[b]oth the State and the
victims of crime have an important interest in the timely enforcement of a [valid]
sentence," Hill, 547 U.S. at 584.  Stays of executions where the conviction and
sentence are valid impose a cost on the State and the family and friends of the
murder victim.  As we have stated many times, "[e]ach delay, for its span, is a
commutation of a death sentence to one of imprisonment."  Thompson v.
Wainwright, 714 F.2d 1495, 1506 (11th Cir. 1983); see McNair v. Allen, 515 F.3d

35

1168, 1176 (11th Cir. 2008) (same); <u>Jones v. Allen</u>, 485 F.3d 635, 641 (11th Cir.

2007) (same); <u>Williams v. Allen</u>, 496 F.3d 1210, 1214 (11th Cir. 2007) (same);

<u>Schwab v. Sec'y, Dep't of Corr.</u>, 507 F.3d 1297, 1301 (11th Cir. 2007) (per

curiam) (same); <u>Rutherford v. McDonough</u>, 466 F.3d 970, 978 (11th Cir. 2006)

(same); <u>Lawrence v. Florida</u>, 421 F.3d 1221, 1224 n.1 (11th Cir. 2005) (same).

## V.  CONCLUSION

Because Bowles seeks to enforce a right under § 1983 that Congress did not

make enforceable against state clemency officials under that statute, he has not

shown a substantial likelihood of success on the merits of his claim that the district

court abused its discretion by denying his motion for a stay.  Nor has he shown that

the balance of equities warrants the entry of a stay of execution for his 1994

murder of Walter Hinton.

Gary Bowles murdered Walter Hinton, John Roberts, and Albert Morris in

separate incidents during 1994.  And he later informed a psychologist that he had

killed three other people as well.  Now, a quarter of a century after his three-

murder year, he wants the carrying out of his death sentence, which was

unanimously recommended by the jury, stayed.  He is not entitled to a stay of

execution, which would amount to a commutation of his death sentence for the

duration of the stay.  <u>See</u> <u>Bucklew v. Precythe</u>, 139 S. Ct. 1112, 1133–34 (2019)

(lamenting that the State's "interests have been frustrated" by the imposition of

legal delays because the defendant "committed his crimes more than two decades ago," and stating that "[t]he people of [the State], the surviving victims of [the defendant's] crimes, and others like them deserve better").

**MOTION FOR A STAY OF EXECUTION DENIED.**

MARTIN, Circuit Judge, concurring:

Like the Majority, I understand 18 U.S.C. § 3599 to authorize federally appointed (and federally paid) habeas counsel to appear in state proceedings.[1]  See Harbison v. Bell, 556 U.S. 180, 185–87, 129 S. Ct. 1481, 1486–87 (2009).  Yet I believe the Majority reaches the correct legal ruling when it holds that Mr. Bowles has not shown a substantial likelihood of success on the merits of his 42 U.S.C. § 1983 claim.  Legal precedent tells me that 18 U.S.C. § 3599 does not unambiguously impose a binding obligation on the States to allow federally appointed habeas counsel to appear in state clemency proceedings to advocate for a death row inmate.  See Blessing v. Freestone, 520 U.S. 329, 341, 117 S. Ct. 1353, 1359 (1997) (stating a federal statue must "unambiguously impose a binding obligation on the States" to be enforceable under § 1983).  For that reason, I must

---

[1] The Majority Opinion seems to suggest that once "the State has already appointed counsel" to represent a death row inmate, § 3599 may not authorize federally appointed and paid counsel to represent their client in state clemency proceedings.  Maj. Op. at 17 n.7.  However, the statute does not make this distinction:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

18 U.S.C. § 3599(e).

agree that the right Mr. Bowles says Congress conferred through § 3599 is not enforceable in a § 1983 action.  See id.; see also Burban v. City of Neptune Beach, 920 F.3d 1274, 1279–80 (11th Cir. 2019).

However, I believe the question presented by Mr. Bowles's case is fully answered by analysis of the third Blessing factor alone, which means there was no need for the Majority opinion to discuss the other factors.  See Burban, 920 F.3d at 1279 ("If a provision fails to meet any one of the three Blessing factors, it does not provide a person with a federal right enforceable under § 1983.").  With regard to the Blessing analysis contained in the Majority opinion, therefore, I join only that related to the third of its requirements.  Neither do I join in the analysis contained in the Majority opinion regarding the requirements for a stay of execution, beyond that related to the first factor: substantial likelihood of success on the merits.  See Hill v. McDonough, 547 U.S. 573, 584, 126 S. Ct. 2096, 2104 (2006) (explaining that inmates seeking a stay of execution "must satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits").

I also write separately to express my view that both Mr. Bowles and the Florida Commission on Offender Review (the "Commission") could have benefited by having counsel from the Capital Habeas Unit of the Federal Public Defender for the North District of Florida ("CHU") continue to represent Mr. Bowles in his state clemency proceedings.  It is puzzling that the Commission

39

barred the knowledgeable and willing CHU lawyers from representing Mr. Bowles. Just as I must acknowledge that Mr. Bowles may not enforce a legal right to be represented by counsel from the CHU, neither was there any legal impediment to those lawyers appearing on his behalf. Thus, it is not only mysterious but possibly tragic that counsel was turned away.

Attorneys from the CHU have specialized training in the intricacies of death penalty litigation. And Mr. Bowles's CHU counsel represented him in his federal habeas proceedings. As a result, they became intimately familiar with Mr. Bowles's history of being physically and sexually abused; the neglect and abuse he suffered at the hands of his mother; his intellectual disabilities; his early introduction to substance abuse; and the details of his life as a homeless child prostitute. This wealth of knowledge about Mr. Bowles would have aided the Commission members in learning whether he would be a good candidate for executive clemency. See Fla. Stat. § 947.13(e) (noting the Commission must report to the Clemency Board about an inmate's "social, physical, mental, and psychiatric conditions and histor[y]"); see also Am. Bar Ass'n, Death Without Justice: A Guide for Examining the Administration of the Death Penalty in the United States, 63 Ohio State L.J. 487, 511–12 (2002) (listing factors that may be considered during the clemency process).

Instead of hearing from Mr. Bowles's experienced and knowledgeable counsel, the Commission appointed a new lawyer. According to Mr. Bowles's filings, this new lawyer had never handled a death penalty case at any stage. Also, at the time of his appointment, this lawyer had no familiarity with Bowles's history. Perhaps it was for these reasons that the new lawyer welcomed participation by the CHU lawyers in Mr. Bowles's clemency proceedings. The Commission, on the other hand, was not welcoming at all. For me, the Commission's decisions to bar the appearance of experienced counsel casts a shadow over Mr. Bowles's clemency proceeding.

Particularly in cases where the State intends to take a man's life, clemency proceedings play an important role. Clemency power is "a prerogative granted to executive authorities to help ensure that justice is tempered by mercy." Cavazos v. Smith, 565 U.S. 1, 8–9, 132 S. Ct. 2, 7 (2011) (per curiam). And the Supreme Court has repeatedly recognized that "[c]lemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." Herrera v. Collins, 506 U.S. 390, 411–412, 113 S. Ct. 853, 866 (1993) (footnote omitted); see also Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 288–89, 118 S. Ct. 1244, 1253–54 (1998) (O'Connor, J., concurring) (recognizing that death row inmates have a limited due

41

process interest in their state clemency proceedings).[2]  Clemency is "the fail safe in our criminal justice system."  Harbison, 556 U.S. at 192, 129 S. Ct. at 1490 (2009) (quotation marks omitted).  That the State of Florida would turn away competent counsel from Mr. Bowles' clemency proceeding devalues the role that clemency was long ago established to play in our criminal justice system.

Florida law gives the Commission the authority and responsibility to "conduct a thorough and detailed investigation into all factors relevant to the issue of clemency and provide a final report to the Clemency Board."  Fla. R. Exec. Clemency 15(B); see Fla. Stat. § 947.13 (powers and duties of the commission). The Commission must report to the Clemency Board on "the circumstances, the criminal records, and the social, physical, mental, and psychiatric conditions and histories of persons under consideration [for clemency]."  Fla. Stat. § 947.13(e). For inmates who have been sentenced to die at the hands of the state, yet who are seeking a commutation of their death sentence, the Commission must conduct "an interview with the inmate, who may have clemency counsel present."  Fla. R. Exec. Clemency 15(B).  This clemency process is likely the last opportunity a death-sentenced inmate has to persuade the State that his life is worth sparing.  I cannot understand why Florida would fail to equip itself with the most fulsome

---

[2] This Court has recognized that the holding in Woodard was provided by Justice O'Connor's concurring opinion.  See Wellons v. Comm'r, Ga. Dep't of Corr., 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (per curiam).

presentation possible, when its charge is to be sure that the execution of a man is not a miscarriage of justice.  The same holds true for its charge to examine whether a man warrants mercy.

When Mr. Bowles appeared for his clemency interview, he did not have the counsel who had been by his side through his federal habeas proceedings.  This happened, even though federal law funds counsel for this purpose, *and* his habeas counsel was ready to represent him.  See 18 U.S.C. § 3599(e).  Mr. Bowles, the Commission, and the Clemency Board all would have benefitted from continuity of counsel.  See Harbison, 556 U.S. at 193, 129 S. Ct. at 1490–91 (recognizing that in designing § 3599, "Congress likely appreciated that federal habeas counsel are well positioned to represent their clients in the state clemency proceedings that typically follow the conclusion of [federal habeas] litigation").  This is especially troubling because neither the District Court's records nor the records before this Court offer any explanation as to why the Commission turned away CHU counsel.

There are currently 343 men and women on Florida's death row.  See Death Row Roster, Fla. Dep't of Corr., http://www.dc.state.fl.us/OffenderSearch/deathro wroster.aspx (last visited Aug. 16, 2019).  Florida gives each of them an opportunity to seek clemency from the governor, "as a matter of grace," Woodard, 523 U.S. at 280–81, 118 S. Ct. at 1250 (plurality opinion).  Grace would include, in my view, the opportunity for them to make their very best case for mercy.

43